# EXHIBIT A

Electronically FILED by Superior Court of California, County of Los Angeles on 08/09/2021 10:25 AM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Perez,Deputy Clerk

Case 2:21-cv-08401   Document 1-1   Filed 10/22/21   Page 2 of 69   Page ID #:10

Assigned for all purposes to: Spring Street Courthouse, Judicial Officer: Daniel Crowley

LAW OFFICES OF

WALKUP, MELODIA, KELLY & SCHOENBERGER

A PROFESSIONAL CORPORATION

650 CALIFORNIA STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94108-2615
T: (415) 981-7210 · F: (415) 391-6965

RICHARD H. SCHOENBERGER (State Bar #122190)
rschoenberger@walkuplawoffice.com
SPENCER J. PAHLKE (State Bar #250914)
spahlke@walkuplawoffice.com
SARA M. PETERS (State Bar #260610)
speters@walkuplawoffice.com

EVERYTOWN LAW
Eric Tirschwell (motion for admission *pro hac vice* forthcoming)
etirschwell@everytown.org
Len Hong Kamdang (motion for admission *pro hac vice* forthcoming)
lkamdang@everytown.org
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
(mailing address)
Telephone: (646) 324-8222
Facsimile:  (917) 410-6932

**ATTORNEYS FOR PLAINTIFFS**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| CLAUDIA APOLINAR and EMMANUEL PEREZ-PEREZ,<br><br>Plaintiffs,<br><br>v.<br><br>POLYMER80, INC., a Nevada corporation, and DOES ONE through FIFTY,<br><br>Defendants. | Case No. 21STCV29196<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1.     This case is about the unlawful and negligent sale of an untraceable

home-assembled "ghost gun" kit that resulted in the September 2020 ambush

1  shooting of Los Angeles County Sheriff's Deputies Claudia Apolinar and Emmanuel

2  "Manny" Perez-Perez, each of whom sustained multiple severe wounds.

3      2.      On the evening of September 12, 2020, Sheriff's Deputies Apolinar and

4  Perez-Perez (hereafter "Perez") were on a routine shift sitting in a marked patrol

5  cruiser near the Martin Luther King Jr. Transit Center in Compton, CA.

6      3.      A man dressed in black shorts, a grey sweater, and armed with a

7  Polymer80 ghost gun pistol silently approached the passenger side window of their

8  patrol cruiser under cover of night. Without warning, he ambushed them.

9      4.      Deputy Apolinar was seated in the driver's seat. The first indication she

10 had of an attack was the sound of shots coming from her assailant's Polymer80 pistol

11 at point blank range. She immediately felt a searing, warm pain. She tried to radio

12 for help but could not speak. She would later learn that one of multiple gunshot

13 injuries she suffered was to her jaw. She could not speak because the shooter's bullet

14 had sliced apart her tongue.

15     5.      For Deputy Perez, the first indication of an attack was a glimpse of

16 movement out of the corner of his eye. Before he could react, he heard the sound of

17 gunfire – four shots – and saw the flash of the muzzle. He immediately tried to call

18 for help but his radio, which he later learned was struck by a bullet, was inoperable.

19 He tried to open his door to defend himself against the attacker but found he was

20 unable to use his hands. One of his multiple gunshot wounds was in his right arm.

21     6.      After both Deputies were shot, Deputy Perez was eventually able to

22 open the door with his left hand. He first tried to determine whether the shooter had

23 fled the scene. He attempted to apply a tourniquet to his own bleeding arm but was

24 unable to. He then scrambled around the hood of the car to the driver's side and saw

25 that his partner Deputy Apolinar had been shot in the face. Together, they hid

26 behind a pillar, as they were unsure of the shooter's location. Deputy Apolinar

27 examined her partner's wounds and applied a tourniquet to his arm. Deputy Perez

28 realized that his partner's radio was activated but that she could not speak. Using

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

2
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  his partner's radio, he called for help. The two of them waited until other Sheriff's
2  Deputies arrived and transported them to the hospital.

3      7.    Days later, during a pursuit of a carjacker, the suspect – Deonte Murray
4  (the "shooter") – discarded a gun that was matched by ballistics to the ambush of
5  Deputies Apolinar and Perez.

6      8.    The shooter was charged with attempted murder, assault with a deadly
7  weapon, and being a convicted felon illegally in possession of a firearm, among other
8  crimes.

9      9.    The shooter was a California resident who had a history of prior felony
10  convictions that made it illegal for him to purchase or possess firearms, including
11  convictions for firearm possession, sale and possession of narcotics, receiving stolen
12  property, and burglary and terrorist threats.

13      10.   At all relevant times, Polymer80, Inc. ("Polymer80") and Does One
14  through Fifty (collectively "Defendants") – manufactured, advertised, and sold
15  firearm kits that included some or all the components necessary to quickly and easily
16  build complete and fully functional frames and weapons, including Glock-style semi-
17  automatic handguns like the one used to ambush Plaintiffs.

18      11.   These do-it-yourself firearms are commonly known as "ghost guns"
19  because they lack serial numbers and are therefore extremely difficult, if not
20  impossible, for law enforcement to trace when recovered in connection with criminal
21  investigations.

22      12.   Because a central purpose of ghost guns is that they are untraceable, it
23  is difficult and often impossible to determine with certainty who manufactured, sold,
24  purchased, or transferred a particular ghost gun. Nevertheless, the firearm used in
25  the attack of Deputies Apolinar and Perez has been identified as a Polymer80
26  handgun, model PF940c. Upon information and belief, the firearm had no serial
27  number and bore no identifying characteristics save for a "P80" logo—the insignia of
28  Defendant Polymer80—stamped on the gun.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

3

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

13.     Upon information and belief, the unserialized Polymer80 firearm used in the ambush attack of Sheriff's Deputies Apolinar and Perez was originally purchased as a kit in California from either Polymer80 or one of Polymer80's third party distributors, who sold it without performing a background check.

14.     Defendants sold Polymer80 ghost gun kits without serial numbers and without taking reasonable steps to ensure that purchasers are legally allowed to purchase or possess firearms, despite knowing that their deadly products are especially attractive to criminals and would likely and foreseeably end up in the hands of dangerous persons prohibited from legally owning firearms under federal and state law.  Furthermore, Defendants did not take reasonable steps to ensure that law enforcement could trace their assembled firearms if they were used in crimes. In fact, Defendants purposefully sold their products without markings to make it difficult for law enforcement to trace the firearm.  Defendants knew and could foresee – but consciously disregarded the risk – that they were creating and contributing to a direct and secondary market for illegal, unserialized and untraceable guns, knowing that their firearms were likely to end up in the hands of criminals and were likely to be used for criminal purposes like the ambush shooting of the Plaintiffs.

15.     The proliferation of ghost guns has become a nationwide public health emergency, as these firearms have increasingly become weapons of choice for criminals. According to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), from 2016 to 2020 there were approximately 23,906 suspected privately made ghost guns reported to ATF as having been recovered by law enforcement from potential crime scenes, including 325 homicides or attempted homicides.[1]

---

[1] May 21, 2021 Proposed Rule Docket No. ATF 2021R-05, Federal Register Vol. 86, No 97 at 27722 *available at* https://www.govinfo.gov/content/pkg/FR-2021-05-21/pdf/2021-10058.pdf (last accessed August 6, 2021)(hereafter "Proposed Rule").

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

4

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

16.     The proliferation of ghost guns has been an especially severe problem in California and Los Angeles in particular.  In recent years, nearly 33% of all firearms recovered from federal criminal investigations across California lacked serial numbers.[2]  In the Los Angeles area, the ATF has stated that over 40% of its recoveries are ghost guns.[3]

17.     According to public reports and legal filings, Polymer80 is by far the largest seller and manufacturer of ghost gun kits and components. For example, of approximately 1,475 ghost guns seized in 2019 and entered into the ATF's database of ballistic images, over 86% (1,278) were assembled from Polymer80 components.[4] In 2020, the LAPD recovered over 700 firearms with Polymer80 components during the course of criminal investigations.

18.     Polymer80 is currently under federal criminal investigation for its sale of ghost gun kits.  In December 2020, the ATF executed a search warrant at Polymer80's Nevada headquarters as part of its investigation into Polymer80's sales of all-in-one "Buy Build Shoot Kits," from which purchasers can quickly and easily assemble their own Glock-style semi-automatic handguns – the same type of firearm used in the ambush shooting of Deputies Apolinar and Perez.[5]

19.     Polymer80's core products—gun building kits that are quickly and easily assembled into operable weapons—fall under the definition of "firearm" and, in certain instances, "handgun" under federal law.  Therefore, Polymer80's business

---

[2] Alain Stephens, Ghost Guns Are Everywhere in California, THE TRACE (May 17, 2019), https://www.thetrace.org/2019/05/ghost-gun-california-crime/.

[3] Brandi Hitt, Ghost Guns' Investigation: Law Enforcement Seeing Unserialized Firearms on Daily Basis in SoCal, ABC7 LOS ANGELES (January 30, 2020), https://abc7.com/5893043/.

[4] Affidavit of ATF Special Agent Tolliver Hart, *In the Matter of the Search of the Business and Federal Firearms Licensee known as Polymer80, which is located at 134 Lakes Blvd., Dayton, NV 89403*, 3:20-mj-123-WGC, ¶ 28(e) (D. Nev. Dec, 9, 2020)(hereafter "ATF Affidavit").

[5] ATF Affidavit at ¶ 28(c).

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

5

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  practice of selling gun building kits without serial numbers, without conducting

2  background checks, and to purchasers residing in a different state, is illegal under

3  federal law.

4      20.    Defendants have also violated California law by aiding and abetting the

5  manufacture of handguns that fail to comply with (a) the safety requirements of

6  California's Unsafe Handgun Act and (b) California's certification and serial number

7  requirements.  Indeed, the ATF has stated in a search warrant application that

8  "manufacturing or assembling a firearm made with [Polymer80] pistol frames is

9  unlawful in California."[6]

10      21.    Defendants created a public nuisance and acted with gross negligence,

11  recklessness, and malice towards Plaintiffs and all Californians, and acted with

12  conscious disregard for the health and safety of Plaintiffs and all Californians, by

13  creating a market that unreasonably and directly and indirectly put untraceable, no-

14  background check guns in the hands of dangerous persons, foreseeably resulting in

15  the use of its guns in criminal acts.

16      22.    By this lawsuit, Plaintiffs seek to hold Polymer80 and its principals

17  accountable for its role in facilitating and causing one particularly reprehensible

18  criminal act carried out with one of its ghost guns: the ambush shooting of Sheriff's

19  Deputies Apolinar and Perez in September 2020.

20      23.    Plaintiffs, as law enforcement officers themselves, seek accountability –

21  not only the accountability of the shooter which he will face in the context of his

22  criminal prosecution, but also the civil responsibility of those who recklessly equipped,

23  enabled, and empowered the shooter to commit his crimes.

24

25

26

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

[6] ATF Affidavit at ¶ 65, note 6

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1                                 **PARTIES**

2        24.    Claudia Apolinar is a Los Angeles County Sheriff's Deputy, who

3 graduated from the Los Angeles County Sheriff's Deputy Training Academy in 2019.

4 As a college student, she took criminal justice classes from former law enforcement

5 officers. She was inspired by their commitment to service and bravery. She loves the

6 community where she grew up – East Los Angeles.  When her son was born, she

7 decided to pursue work in a field where she could help ensure that the East Los

8 Angeles area she grew up in was as safe and supportive as she remembered. Her

9 career in law enforcement allows her to realize that vision.

10       25.    Emmanuel Perez is a Los Angeles County Sheriff's Deputy, who

11 graduated in the same Sheriff's Deputy Training Academy 2019 class as Claudia

12 Apolinar. Growing up in a working class Mexican American community, he had a

13 number of negative experiences with law enforcement. Yet, he became a Sheriff's

14 Deputy because he believes that police officers can play a vital role in his community.

15 He wants to serve as a positive example of law enforcement in his city.  As a Los

16 Angeles County Sheriff's Deputy, he has always been committed to treating everyone

17 he meets fairly and with dignity and respect.

18       26.    Defendant Polymer80, Inc. is a Nevada corporation with its principal

19 place of business in Dayton, Nevada.  Polymer80, Inc. holds a Federal Firearms

20 License.

21       27.    Defendants, and each of them, knowingly structured their business to

22 knowingly circumvent governing federal and state laws applicable to firearms and

23 handguns, by opting to design readily manufactured unserialized gun and frame kits

24 and selling them without background checks.

25       28.    The true names and capacities, whether individual, corporate, or

26 otherwise, of Does One through Fifty, inclusive, are presently unknown to Plaintiffs,

27 who therefore sue them by fictitious names.  Plaintiffs shall amend the complaint to

28 show the true names of each fictitiously named defendant when ascertained.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

29.     Plaintiffs allege that, in addition to acting on its own behalf, all of the acts and omissions described in this Complaint by Polymer80 were duly performed by, and attributable to, all Defendants, whether named or unnamed, with each acting as agent, ostensible agent, employee, alter ego, joint enterprise and/or under the direction and control of the others, and such acts and omissions were within the scope of such agency, ostensible agent, employment, alter ego, joint enterprise, direction, and/or control.  Any reference in this Complaint to any acts of Defendants shall be deemed to be the acts of each Defendant acting individually, jointly, or severally.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction under California Code of Civil Procedure § 410.10 because Plaintiffs are domiciled in the State of California, the site of injuries was in the State of California, and the amount in controversy exceeds $25,000.

31.     The Court has personal jurisdiction over Defendants in that, at all relevant times, Defendants, and each of them, did business in the State of California, and otherwise had the requisite minimum contacts with the State to justify this Court exercising jurisdiction over them.

32.     Specifically, the Court has personal jurisdiction over Defendants because Polymer80 purposely avails itself of California markets by intentionally advertising and selling its products to California residents, both online and through its network of distributors, including through state-based distributors, thereby taking advantage of the benefits and privileges of the laws of the State of California. Shipping records obtained by ATF show that Polymer80 shipped approximately 9,400 items to customers in California between January 2019 and October 2020, including at least 202 Buy Build Shoot kits containing all the components necessary for the purchaser to quickly assemble a complete and operable firearm.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

8

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1    33.    Venue is proper pursuant to California Code of Civil Procedure § 395(a)

2  because the place of injuries and losses occurred in the city of Compton, California,

3  which is within the County of Los Angeles.

### GENERAL ALLEGATIONS

5  *The Aftermath of the Ambush Shooting*

6    34.    As described above, the shooter shot Sheriff's Deputy Apolinar in the

7  jaw—shattering it and slicing her tongue in half.  For two months after the incident,

8  her doctors prescribed her an all-liquid diet after they wired her jaw shut to heal. She

9  continues to suffer from permanent tongue damage and weakness in her jaw. Her

10  lower lip and chin remain numb because the nerve connecting to the lower part of her

11  face was severed during the ambush.

12    35.    Deputy Apolinar was also shot in both arms and suffered broken bones

13  in each arm. She cannot carry a gallon of milk with her right arm.

14    36.    Deputy Apolinar spent six days in the intensive care unit.

15    37.    Deputy Apolinar thinks about the ambush every day. When she came

16  home from the hospital, her young son recoiled in fear at the sight of her because of

17  her injuries. They are still working to rebuild their relationship. Her injuries prevent

18  her from doing many of the activities she enjoyed with her son before the ambush.

19  She cannot even pick him up.

20    38.    After the ambush, Sheriff's Deputy Perez learned that he had actually

21  been shot a total of five times. He was shot in the head. He was also shot in the hand,

22  resulting in a shattered bone. Another bullet entered his arm and shattered his

23  humerus bone. Another bullet went through his shirt, skidded off his bulletproof vest,

24  and disabled his handheld radio.

25    39.    Because of these injuries, Deputy Perez suffered a concussion and

26  brain bleeding. He underwent surgery on his hand and elbow, including a bone graft

27  from his hip.  He required three plates surgically inserted onto his humerus bone,

28  which was broken in three places. Additionally, he now has multiple plates and

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  screws in his hand and arm to hold the shattered bones together, and he is informed
2  that he requires additional surgery to restore function in his hand. He suffers from
3  numbness in his right hand on his index finger and running to the top of his hand.
4  He cannot lift more than ten pounds with his injured arm.

5       40.    Deputy Perez struggles with sleep every night and is receiving mental
6  health support for his trauma. He suffers from flashbacks. He had no previous
7  mental health issues before the ambush. Before his injury he loved being around his
8  family, but he now feels withdrawn and irritable for reasons he cannot explain. He
9  increasingly avoids interactions with other people.

10      41.    Neither Deputy Apolinar nor Deputy Perez has been cleared to return to
11 duty.

12 **The Shooter**

13      42.    As noted above, the shooter is a California resident who had a history of
14 multiple prior felony convictions that made it illegal for him to purchase or possess
15 firearms.

16      43.    The shooter was able to commit the ambush shooting of the Deputies
17 because Defendants' deliberate and reckless acts created a direct and secondary
18 market that foreseeably provided prohibited persons like the shooter with easy access
19 to unserialized ghost guns assembled from kits and purchased without any
20 background check.

21      44.    Upon information and belief, the shooter chose to shoot the Deputies
22 with this Polymer80 ghost gun in substantial part because he knew it was
23 unserialized and untraceable by normal means.

24 **Ghost Gun Basics**

25      45.    A firearm made by a federally licensed manufacturer must be engraved
26 with identifying information: a unique serial number, as well as the make and model.
27 A ghost gun is a do-it-yourself, homemade gun made from commercially available
28 building blocks. It is assembled by an individual rather than by an ATF-licensed

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

10
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

manufacturer or importer.  A ghost gun has three key, related characteristics:  it is unserialized, it is virtually untraceable, and its core building blocks (the frame for a handgun, or the receiver for a rifle) are acquired without a background check.

46.    In a pistol (such as a Glock 17, pictured below), the frame provides the basic bottom outline of the gun, housing the trigger and the magazine, while providing a foundation for the slide and barrel (i.e., the parts a bullet passes through when fired and from which cartridges are ejected).



47.    Most ghost guns are made from "unfinished" frames and receivers, which means they lack machine marking or drilling in certain specified areas (typically, the fire control cavity or trigger area).  Unfinished frames and receivers are often marketed as "80%" complete, such that a buyer needs to do only a small percentage of the work—typically, drilling out certain parts—for the frame or receiver to be "finished" and then assembled into an operable firearm.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

11
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  *The sale of ghost guns has created an urgent and continuing public safety*
2  *emergency*

3      48.    The sale of ghost gun kits undermines sixty years of federal law directed
4  at preventing dangerous persons from possessing firearms and assisting law
5  enforcement in tracing firearms.  In 1968, amid rising rates of violent crime and
6  following several high-profile assassinations—including the killing of President
7  Kennedy with a rifle ordered through the mail—Congress passed landmark
8  legislation to assert federal control over the manufacturing, distribution, purchase,
9  and sale of firearms.  One of the principal aims of the Gun Control Act of 1968 (the
10  "Act") was to eliminate the ability of criminals, minors, and persons with dangerous
11  histories to obtain mail-order firearms without any federal oversight or regulation.
12  To achieve this aim, the Act mandated that firearms dealers be federally licensed and
13  that every firearm be stamped with a serial number so that law enforcement could
14  trace the origin of the firearm if it ended up being used in a crime.  The Act was later
15  amended to require a background check on all purchases of firearms from licensed
16  sellers.

17      49.    Typically, when police recover a firearm, they use the included serial
18  number and other markings to initiate a trace request through the ATF.  By tracing
19  a gun back to its first sale at retail, law enforcement agencies gain an additional lead
20  in an investigation, identify straw purchasers and traffickers, and figure out how a
21  gun arrived at a crime scene.

22      50.    As noted above, because they are unserialized, ghost guns are intended
23  to be, and often are, untraceable back to their original purchaser or subsequent
24  transferees.  Ghost guns have no recorded history and no records associated with
25  them.  The untraceability of ghost guns is one of their selling points and makes them
26  attractive to criminals and gun traffickers trying to avoid responsibility when their
27  guns are recovered by law enforcement.  As one federal appellate court has explicitly
28  noted in the analogous context of handguns with obliterated serial numbers, "[t]here

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO CA  94108
(415) 981-7210

12
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1   would appear to be no compelling reason why a law-abiding citizen would prefer an

2   unmarked firearm.  These weapons would then have value primarily for persons

3   seeking to use them for illicit purposes."[7]  Sellers of ghost gun kits take the work out

4   of obliterating a serial number and directly and indirectly supply and create a direct

5   and secondary market for such illicit users.

6         51.    Since 2014, sellers of ghost gun kits have proliferated over the internet,

7   with scores of such sellers distributing them during the relevant time period.  These

8   unserialized and nearly complete firearms are often purchased by or otherwise end

9   up in the hands of people who are prohibited from possessing firearms because of

10  age, dangerous mental health history, or criminal history – individuals who are

11  attracted by the ability to purchase nearly complete guns without a background

12  check.

13        52.    Once assembled, ghost guns continue to be especially attractive – and

14  are often sold or transferred – to criminals, who place a high premium on firearms

15  that are untraceable and come with no traceable history of use in prior crimes.

16        53.    The number of ghost guns recovered by law enforcement throughout the

17  country has increased in recent years. As noted above, from January 1, 2016 through

18  December 31, 2020, there were approximately 23,906 suspected ghost guns reported

19  to ATF as having been recovered by law enforcement from potential crime scenes,

20  including 325 homicides or attempted homicides, and that were attempted to be

21  traced by ATF. They are broken down by year as follows:

22        a.    2016: 1,750

23        b.    2017: 2,507

24        c.    2018: 3,776

25        d.    2019: 7,161

26

27  ───────────────

28  [7] *United States v. Marzzarella*, 614 F.3d 85, 95 (3d Cir. 2010).

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1     e.    2020: 8,712[8]

2     54.    The trend in California is consistent with these national numbers.  ATF

3 has estimated that about 2,700 ghost guns were recovered in California in 2019.[9]

4 And as noted above, in 2020, LAPD recovered over 700 firearms with Polymer80

5 components during the course of criminal investigations. Nearly 300 such firearms

6 were recovered from LAPD's South Bureau, which covers south Los Angeles –

7 including the Compton neighborhood where the Plaintiff Deputies were ambushed

8 and shot. LAPD reports that the proportion of recovered firearms that are ghost guns

9 is increasing.  In other words, more and more, criminals are choosing ghost guns to

10 commit crimes.

11     55.    Other horrific examples of ghost gun crimes in California abound.  In

12 November 2019, a 16-year-old student at Saugus High School in Santa Clarita

13 brought a home-assembled ghost gun to school and used it to shoot five of his

14 classmates, killing two before turning the gun on himself.  In May of 2020, two far-

15 right anti-government activists used a ghost gun to murder a security officer for the

16 Oakland federal courthouse and a Sheriff's Deputy in Santa Cruz. A ghost gun built

17 from Polymer80 components was used during a 2019 home invasion robbery and

18 murder of three persons in Glendale. Two ghost guns recovered near the scene of a

19 November 2020 murder in Glendale, carried out by members of the Gardena 13

20 street gang, were built with Polymer80 model PF940C components.[10]

21     56.    The grim, foreseeable, and inevitable result of the reckless and

22 negligent sale of ghost gun kits is the police increasingly finding these dangerous,

23 untraceable weapons at crime scenes.

24

25

26

27 [8] Proposed Rule at 27722-3.

[9] ATF Affidavit at ¶ 28(b).

28 [10] ATF Affidavit  at ¶¶ 28b, 28d.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1 | ***Defendant Polymer80 is Largely Responsible for the Proliferation of Ghost***
2 | ***Guns***

3 | 57. As alleged above, law enforcement statistics show that an
4 | overwhelmingly large percentage of the ghost guns recovered nationwide at crime
5 | scenes were assembled from Polymer80's products, and the same is true in California
6 | and Los Angeles.

7 | 58. At all relevant times, Polymer80 sold untraceable firearm kits and
8 | components without first conducting background checks or taking other reasonable
9 | steps to ensure the purchaser was eligible to buy a gun—foreseeably resulting in
10 | purchase by and transfer to persons who cannot legally obtain a serialized, traceable
11 | weapon from a licensed dealer, and to persons for whom such a weapon is
12 | particularly desirable for use in unlawful acts.

13 | 59. At all relevant times, Polymer80 offered "Buy Build Shoot" kits—which,
14 | until recently,[11] were sold directly by Polymer80 before Polymer80 ceased sales, and
15 | which are still being offered for sale by resellers.[12] With one of these kits, a
16 | purchaser could obtain a nearly finished Glock-type semiautomatic pistol—the
17 | precise firearm used in the ambush on Plaintiffs – and quickly and easily assemble it
18 | into a completed, operable firearm. Polymer80's website described these kits as
19 | "contain[ing] all the necessary components to build a complete PF940C™ or
20 | PF940v2™ pistol."[13] A Polymer80 Buy Build Shoot kit can be completed into a

---

22 | [11] Polymer80 advertised these kits as recently as December 12, 2020. *See*
23 | "Polymer80 BBS™ Kits," Polymer80, archived webpage from Dec. 12, 2020, *available at*
24 | https://web.archive.org/web/20201212165741/https://www.polymer80.com/pistols/bbskits (last visited July 19, 2021).

25 | [12] Although Polymer80's Buy Build Shoot kits are not currently advertised for sale
26 | on Polymer80's own website, they are still being advertised for sale on some resellers'
27 | websites. *See, e.g.*, https://www.armorally.com/shop/polymer80-pf940c-g19-buy-build-shoot-kit/ (last visited August 6, 2021).

28 | [13] Polymer80, archived webpage from Dec. 12, 2020, *available at*

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

15
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1    functioning firearm in under thirty minutes.[14]  Such a kit is designed to be and may
2    readily be converted into an operable weapon.  It also is a combination of parts from
3    which a firearm which has a short stock and is designed to be held and fired by the
4    use of a single hand can be assembled.

5    　　　60.　　The images below are screenshots of a cached Polymer80 webpage from
6    December 11, 2020 relating to the Buy Build Shoot kit.



7
8
9
10
11
12
13
14
15
16
17
18
19
20

21   　　　61.　　In addition to the full Buy Build Shoot kits, at all relevant times
22   Polymer80 advertised and sold frame kits for handguns and lower receiver kits for
23   AR-15 and AR-10 style rifles.[15]  These unfinished frame and receiver kits are
24

25   https://web.archive.org/web/20201212165927/https://www.polymer80.com/P80-Buy-
     Build-Shoot-kit-PF940v2-10-Round-Magazine-Gray (last visited July 19, 2021).
26
     [14] Proposed Rule at FN54.
27
     [15] "P80 80% Pistol Frame Kits," Polymer80, *available at*
28   https://www.polymer80.com/pistols/80percentpistolkits (last visited July 19, 2021);

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

1 designed to be, and can quickly and easily be converted into, working frames and
2 receivers that form the core component of a functioning firearm. As of July 19, 2021,
3 Polymer80 was still advertising the sale of these frame kits and lower receiver kits
4 through its website.[16] Polymer80's pistol frame kits were at all relevant times sold
5 with a "complete finishing jig and drill bits," as illustrated in the figure below, which
6 is a screenshot of a Polymer80 webpage, taken on February 14, 2021, showing a
7 Polymer80 80% pistol frame kit for sale.



18     62.    At all relevant times, Polymer80 also sold other components to enable
19 customers to assemble a complete handgun, including pistol barrels, slides, and
20 trigger assemblies.

21     63.    At all relevant times Polymer80 also misleadingly suggested on its
22 website that ATF had concluded that its *kits* are not firearms under federal law,
23 when in fact: (a) ATF had only issued determination letters that concluded
24 (erroneously) that certain Polymer80 standalone unfinished frames and receivers as
25 submitted were not classified as firearms (including a PF940C standalone "blank"),

26

27 "80% AR Receiver Kits," Polymer80, *available at*
https://www.polymer80.com/arreceivers (last visited July 19, 2021).

28 [16] *Id.*

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

1    but (b) ATF had never issued any such non-firearm classifications as to Polymer80's

2    frame and receiver *kits* and instead had sent Polymer80 correspondence in February

3    2018 indicating that a PF940V2 pistol frame kit might well be considered a firearm

4    and seeking further information.  After having misled the ATF that its PF940

5    product "is void of any indicators that designate or provide guidance in completion of

6    the firearm," Polymer80 never provided the requested additional information to allow

7    ATF to make a determination as to its PF940 when sold in kit form.[17]

8         64.    Beyond selling these products, at all relevant times Polymer80

9    substantially assisted the assembly of these firearms by offering written step-by-step

10   assembly instructions online, accompanied by supplemental videos, to facilitate the

11   manufacture of both pistols and semi-automatic rifles in a matter of a few hours or

12   less.  Polymer80 even touted its superior customer service that is on standby to assist

13   its customers in manufacturing firearms from its kits.  "We want to give the

14   customers all the tools they need, as much as we can anyway, to complete this

15   product."[18]

16        65.    By selling kits and all the component parts together with the means to

17   quickly, easily, and readily convert the kits and parts into operable firearms,

18   Polymer80 effectively put firearms into circulation while subverting regulations that

19   apply to the sale of firearms. This uniquely dangerous method of distribution placed

20   the public at risk and allowed and attracted dangerous prohibited users—like the

21   shooter who ambushed Plaintiffs—to obtain their products for use in violent crime.

22        66.    Defendants' sales practices make a mockery of federal and state

23   background check laws. Before completing each sale, Defendants not only failed to

24   conduct formal background checks or require its distributors/resellers to do so, on

25   information and belief, Defendants asked direct retail customers to merely "self-

26   _____

27   [17] ATF Affidavit at ¶¶ 37-45.

28   [18] Shooters Nation, *020 Dan McCalmon of Polymer 80*, YOUTUBE (Aug. 10, 2018),
     *available at* https://www.youtube.com/watch?v=nybZ3iNfUhU.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

18
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  certify" that they do not have a felony record. By doing so, Defendants knowingly

2  flouted federal and state law by projecting compliance through an utterly ineffective

3  system. Not surprisingly, ATF has confirmed that Polymer80, or a reseller, sold Buy

4  Build Shoot kits to addresses in California where individuals with felony convictions

5  resided.[19]

6      67.    Polymer80 was sued on June 24, 2020, by the Attorney General for the

7  District of Columbia for illegally selling ghost gun frame and receiver kits into the

8  District of Columbia.  That lawsuit put Polymer80 on notice that in 2017, the District

9  recovered three ghost guns, followed by 25 in 2018, and 116 in 2019; that the District

10  was on track to set a new record in 2020, with 106 ghost guns recovered between

11  January 1 and May 29 alone; that of the 250 ghost guns recovered since 2017, 208

12  were produced by Polymer80; and that Polymer80 handguns had been recovered in

13  connection with nine homicides in the District.

14      68.    The shooter was within the class of foreseeable users, and indeed was

15  part of the intended market, for Defendants' ghost gun kits, even though federal and

16  California law prohibited the shooter from purchasing, owning or possessing firearms

17  because of his prior felony criminal history.

18      69.    Defendants' method of distribution and marketing—direct to purchasers

19  with no formal background check necessary and untraceable to the authorities, and

20  indirect through resellers without a serial number or any reasonable measures to

21  ensure sales only to eligible purchasers—was foreseeably attractive to a person with

22  the shooter's background. Prior to the ambush, Defendants knew that this means of

23  distribution and marketing would be particularly attractive to prohibited users like

24  the shooter.

25      70.    Defendants nevertheless disregarded the foreseeable risk that their

26  reckless marketing, sales, and distribution of unserialized ghost gun kits and parts

27

28

[19] ATF Affidavit at ¶ 87.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

19
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  would cause their products to end up in the hands of dangerous prohibited users to

2  ultimately be used in crimes. They took no reasonable steps to prevent their product

3  from ending up in the hands of prohibited individuals like the shooter. The shooter

4  was able to obtain one of Defendants' firearm kit products and chose to ambush

5  Deputies Apolinar and Perez with a Polymer80 firearm in substantial part because

6  Defendants disregarded these foreseeable risks.

7  **I.     DEFENDANTS' UNLAWFUL ACTS**

8  **A.     The Federal Gun Control Act**

9  71.     The Federal Gun Control Act (the "Gun Control Act"), 18 U.S.C. §

10  921(a)(3) (emphasis added), provides:

> The term "firearm" means (A) any weapon (including a
> starter gun) which will or is **designed to or may readily
> be converted** to expel a projectile by the action of an
> explosive; (B) the frame or receiver of any such weapon; (C)
> any firearm muffler or firearm silencer; or (D) any
> destructive device.  Such term does not include an antique
> firearm.

15  72.     At all relevant times, Polymer80 sold Buy Build Shoot kits consisting of

16  all component parts of a firearm, including unfinished handgun frames, which are

17  "designed to" be and "may readily be converted" into an operable weapon.  At all

18  relevant times Polymer80 also sold frame and receiver kits containing an unfinished

19  "frame" or "receiver" along with jigs and drill bits designed to enable a customer to

20  complete the frame or receiver.  These too are "designed to" be and "may readily be

21  converted" into the finished frame or receiver of an operable weapon. Accordingly,

22  Polymer80 knowingly sold "firearms" under § 921(a)(3). In fact, in applying for a

23  warrant to search Polymer80's premises, the ATF represented to a federal court that

24  "ATF Chief Counsel has ... determined that the Buy Build Shoot kits are, as a matter

25  of law, firearms pursuant to 18 U.S.C. section 921(a)(3)."[20]

26

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

---

[20]  ATF Affidavit at ¶ 65, note 6.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

73.     Because the kits that Polymer80 sold are firearms under federal law, a number of requirements and obligations arise.  As noted above, federal law requires that firearm sellers obtain a federal firearm license ("FFL") prior to engaging in the business of dealing in firearms, *see* 18 U.S.C. § 922(a)(1), and prohibits the shipment by an FFL of a firearm directly to a purchaser, § 922(a)(2), or sale or delivery of a firearm by a seller with a FFL to a person residing in another state, § 922(b)(3). Federal law also requires that firearms dealers and manufacturers conduct a background check before transferring firearms, and that manufacturers inscribe serial numbers on all firearms.[21]  Finally, federal law prohibits selling a firearm to any purchaser who does not appear in person unless the purchaser submits an affidavit as to the legality of the purchase from the seller along with a copy of a notification to local law enforcement and acknowledgement of receipt of the notification, § 922(c).

74.     At all relevant times, Defendants knowingly sold firearms in the form of ghost gun kits without serial numbers and without conducting or requiring background checks or other reasonable steps to ensure eligibility to purchase a gun. Defendants also sold and shipped kits directly to purchasers who did not either appear in person or submit an affidavit as to the legality of the purchase along with a copy of notification to local law enforcement. Finally, Defendants, based in Nevada, knowingly sold and delivered firearms to purchasers residing in other states, including California.

75.     Defendants' above-described business practices and failures to comply with federal firearm statutes and regulations were a proximate cause of the injuries sustained by Plaintiffs when they were ambushed, as well as of the overall increase

---

[21]   18 U.S.C. §§ 922(t)(1) and 923(i). Polymer80 is federally licensed to manufacture firearms, and is therefore subject to the requirements for "licensed manufacturers" set forth in 18 U.S.C. § 922 *et seq.*

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1   in ghost gun-related shootings and ghost gun-related criminal activity in California
2   and the Los Angeles area.

3       **B.    The California Unsafe Handgun Act**

4       76.    In 1999, California passed the Unsafe Handgun Act ("CUHA"), Cal.
5   Penal Code sections 31900, et seq., to establish safety standards for all handguns
6   manufactured, imported, and sold in the state.

7       77.    The primary enforcement clause of CUHA requires that "[a] person in
8   this state who manufactures or causes to be manufactured, imports into the state for
9   sale, keeps for sale, offers or exposes for sale, gives, or lends an unsafe handgun shall
10  be punished by imprisonment in a county jail not exceeding one year."[22]

11      78.    Moreover, CUHA's certification requirement mandates that "[e]very
12  person who imports into the state for sale, keeps for sale, or offers or exposes for sale
13  any firearm shall certify under penalty of perjury and any other remedy provided by
14  law that every model, kind, class, style, or type of pistol, revolver, or other firearm
15  capable of being concealed upon the person that the person imports, keeps, or exposes
16  for sale is not an unsafe handgun[.]"[23]

17      79.    An "unsafe handgun" is defined as "any pistol, revolver, or other firearm
18  capable of being concealed upon the person" that does not have certain safety devices,
19  meet firing requirements, or satisfy drop safety requirements.[24] An "unsafe handgun"
20  also includes, for firearms manufactured after a certain date and not already listed
21  on the roster of handguns tested and determined by the Department of Justice not to
22  be unsafe, handguns that lack a chamber load indicator and magazine disconnect
23  mechanism.

24
25
26

_____

27  [22] Cal. Penal Code § 32000(a).
    [23] Cal. Penal Code § 32005(b).
28  [24] Cal. Penal Code § 31910.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1      80.    Upon information and belief, Polymer80-assembled handguns, originally

2  sold by Defendants as kits, do not comply with CUHA because, among other reasons,

3  they do not meet CUHA's chamber load indicator and magazine disconnect

4  mechanism requirements.

5      81.    As mentioned, CUHA charges the California Department of Justice with

6  compiling and maintaining a roster of handguns that have been tested and

7  determined not to be unsafe, and therefore, "may be sold in this state."[25]

8      82.    The kits sold by Defendants intended to be assembled into handguns

9  and the assembled Polymer80 handguns – like the Polymer80 PF940c used to shoot

10  the Plaintiffs – are not listed on the Roster of Certified Handguns maintained by the

11  State of California.[26]

12      83.    At all relevant times, Defendants knowingly aided and abetted the

13  manufacture of handguns that do not meet the safety requirements of CUHA by

14  marketing, selling, and transferring all of the components, parts, materials, tools and

15  instructional videos needed to build an unsafe handgun in the state.

16      84.    Defendants' actions in aiding and abetting the manufacture of unsafe

17  handguns in California – including, on information and belief, their aiding and

18  abetting the manufacture in California of the Polymer80 PF940c handgun used to

19  shoot Plaintiffs – were a proximate cause of the injuries sustained by Plaintiffs

20  during their ambush, as well as of the overall increase in ghost gun-related shootings

21  and firearms-related illegal activity in the Los Angeles area.

22  **C.    California's Assembly of Firearms Law**

23      85.    Under California's Assembly of Firearms Law, any firearm

24  "manufactured or assembled from polymer plastic" must contain "3.7 ounces of

25

26  [25] Cal. Penal Code § 32015; *Nat'l Shooting Sports Foundation, Inc. v. State of*

27  *California*, 6 Cal. App. 5th 298 (2016).

28  [26] State of California Dep't. of Justice, "Handguns Certified for Sale,"
https://oag.ca.gov/firearms/certified-handguns/search.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

23

1   material type 17-4 PH stainless steel ... embedded within the plastic upon fabrication
2   or construction with the unique serial number engraved or otherwise permanently
3   affixed in a manner that meets or exceeds the requirements imposed on licensed
4   importers and licensed manufacturers of firearms pursuant to subsection (i) of
5   Section 923 of Title 18 of the United States Code and regulations issued pursuant
6   thereto."

7       86.    A purpose of the California's Assembly of Firearms Law was to prevent
8   incidents like the shooting of Plaintiffs by ensuring the serialization of firearms,
9   increasing the probability that shooters would be apprehended and punished, and
10  thereby dissuading would-be shooters from attempting such crimes.

11      87.    Defendants knowingly sold Buy Build Shoot kits and unfinished pistol
12  frame kits that – like the assembled Polymer80 PF940c pistol used to shoot Plaintiffs
13  – do not contain a unique serial number engraved or permanently affixed pursuant to
14  Section 923 of the Gun Control Act, as required under California law.

15      88.    Defendants intentionally highlight the unserialized nature of these
16  firearms in their marketing even though they know that this feature of their product
17  makes them particularly attractive to dangerous prohibited purchasers.

18      89.    Defendants' actions of selling, aiding, and abetting the manufacture and
19  assembly of firearms that fail to comply with California's serialization requirement –
20  including, on information and belief, their aiding and abetting the manufacture in
21  California of the Polymer80 PF940c handgun used to shoot Plaintiffs – were a
22  proximate cause of the injuries sustained by Plaintiffs when they were ambushed, as
23  well as of the overall increase in ghost gun-related shootings and illegal ghost gun-
24  related criminal activity in the Los Angeles area.

25  / / / /
26  / / / /
27  / / / /
28  / / / /

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

24

## CAUSES OF ACTION

## COUNT I – NEGLIGENCE

### (Against all Defendants)

90.     Plaintiffs incorporate and reallege the above paragraphs as if stated fully herein.

91.     At all relevant times, Defendants were subject to the general duty imposed on all persons and entities to act reasonably not to expose others to reasonably foreseeable risks of injury.

92.     In fact, as sellers of ghost gun kits and unfinished frames and receivers, Defendants are subject to the highest duty of care because of the danger that their products can cause.

93.     Defendants had a duty to exercise reasonable care in marketing, distributing, and selling ghost gun kits and components and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others.  A breach of such a duty constitutes negligence.

94.     Defendants acted illegally, negligently, recklessly, with malice and oppression, despicably, and in conscious disregard for the health and safety of others, when they sold and injected into the market the firearm kit and components that were thereafter finished and assembled into the operable firearm used to ambush and shoot Sheriff's Deputies Apolinar and Perez.

95.     At all relevant times, Defendants' negligent, reckless, despicable, and malicious conduct, and their conscious disregard for the health and safety of others, included but was not limited to:

a.  Defendants knew that background checks prior to the purchase of firearms and serialization of firearms were required by California and federal law. Defendants knew that background checks and serialization of firearms are effective measures in preventing and reducing violent crimes. They knew that these were important safety requirements.  At all times, Defendants

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

25

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1    knew or should have known that the proliferation of ghost guns was a

2    problem in California and was contributing to criminal conduct in

3    California. They knew or should have known that selling unserialized ghost

4    guns kits without background checks would attract would-be criminals as

5    purchasers. They knew or should have known that selling unserialized

6    ghost gun kits without background checks would provide to felons, who

7    otherwise were prohibited from owning weapons, easy access to firearms

8    capable of inflicting great bodily injury or death. They knew or should have

9    known that selling unserialized ghost gun kits without background checks

10   would enable, empower, and/or embolden criminals to commit violent

11   crimes that they would not otherwise have committed. They knew or should

12   have known that continued sales of firearms without background checks or

13   serialization would likely cause bodily injury and/or death to innocent

14   people, such as Plaintiffs.

15   b.   Despite their knowledge, Defendants intentionally designed, constituted,

16        packaged, marketed, advertised, and sold ghost gun kits. In fact, they went

17        even further by intentionally designing, constituting, packaging,

18        marketing, advertising, and selling ghost gun kits in such a manner as to

19        make it easy for people with no special equipment or training to quickly

20        assemble a finished and usable firearm. Defendants intentionally designed,

21        constituted, packaged, marketed, advertised, and sold ghost gun kits that

22        were at least as dangerous as a finished firearm (because of their easy

23        conversion to a finished firearm) but were removed from the legal

24        protections, background checks, serialization and other safety requirements

25        that are mandatory in the context of firearm sales, even though Defendants

26        knew of the serious harm this would inflict on, and which would be borne

27        by, innocent members of the public including law enforcement officers

28        attempting to combat crime.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

26
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

    c.  Despite their knowledge that their ghost gun kits were especially attractive to criminals, and that this would inevitably result in serious injury or death to innocent people, Defendants intentionally chose not to take any reasonable steps to verify (or require resellers to attempt to verify) that purchasers or subsequent transferees were not legally prohibited from purchasing or possessing a firearm, and/or unfit to safely possess a firearm.

    d.  Defendants chose to overlook the highly foreseeable and even inevitable risk that a number of those who chose to buy their ghost guns would be criminals who otherwise would not have gained access to such untraceable guns, that a number of those buyers would attack innocent people using the ghost guns, and that a number of those attacks would result in serious injuries or deaths that otherwise would not have occurred. They chose to overlook this harm, and to intentionally embrace it, because they wanted to keep selling ghost guns and making money from those sales. They valued their profits over the lives of innocent people, and this conduct was outrageous, despicable and shocking to the conscience.

96.    Defendants' negligence was a direct and proximate cause of harm to Plaintiffs, by causing and allowing the shooter to gain unlawful possession of a Polymer80 ghost gun firearm, which he chose to use and did use to ambush Sheriff's Deputies Apolinar and Perez.

97.    In addition, Defendants knowingly violated the requirements of federal law, including violations of 18 U.S.C. § 922 and 26 U.S.C. § 5842, by selling firearms without serial numbers and without conducting background checks; as well as California firearms laws, including violations of Cal. Penal Code §§ 31900, et seq. and California's Assembly of Firearms Law, by causing to be manufactured in California and aiding and abetting the manufacture and possession in California of unsafe and unserialized handguns, including the Polymer80 PF940c pistol used to shoot Plaintiffs.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

27

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1      98.    The knowing violations of law by Defendants were a direct and

2  proximate cause of the injuries to Plaintiffs.  These laws are intended to protect

3  public safety by preventing the sale and transfer of firearms to dangerous persons,

4  including especially to individuals with disqualifying criminal records, and

5  preventing access to and use of unsafe handguns across the country and in

6  California.  Defendants flouted those laws for profit, and consciously disregarded the

7  known and foreseeable risks of its business practices, and in so doing, directly and

8  proximately caused injury to Plaintiffs, who are shooting victims within the class of

9  persons these laws were designed to protect, and suffered the type of harm the laws

10  are designed to protect against.

11      99.    As a direct and proximate result of the aforementioned conduct and

12  breach of duty, Plaintiffs sustained and will sustain physical pain, mental suffering,

13  loss of enjoyment of life, anxiety, and emotional distress.

14      100.   As a direct and proximate result of the aforementioned conduct and

15  breach of duty, Plaintiffs have incurred and will continue to incur economic damages,

16  including lost future income, lost earning capacity, and past and future medical

17  expenses and related expenses.

18      101.   Accordingly, Plaintiffs are entitled to recovery against Defendants in an

19  amount to be determined at trial.

20                    **COUNT II- PUBLIC NUISANCE**

21                       *(Against All Defendants)*

22      102.   Plaintiffs incorporate and re-allege the above paragraphs as if stated

23  fully herein.

24      103.   Defendants created a public nuisance by marketing, selling and

25  distributing ghost gun kits to California residents without serial numbers, without

26  background checks, without complying with California gun laws, and without taking

27  any reasonable steps to ensure that purchasers and transferees were not prohibited

28  from purchasing or possessing firearms, despite knowing and consciously

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1 | disregarding the risks that they were (a) creating an illegal market for ghost guns

2 | and (b) directly and  indirectly distributing ghost guns to dangerous persons who are

3 | prohibited from purchasing or possessing firearms under federal and state law and

4 | who were likely to obtain and use such firearms for criminal acts and/or transfer

5 | such firearms to other prohibited persons likely to do the same.  Defendants' actions

6 | have created a significant threat to the public right of health and safety in public

7 | spaces and have unreasonably interfered with public health and safety.  Defendants

8 | have facilitated the purchase and acquisition of unserialized, untraceable guns by

9 | individuals prohibited from acquiring and possessing guns by the state and federal

10 | legislatures, and have acted in a manner that is offensive and intolerable, with

11 | malice and oppression and in conscious disregard of the health and safety of others.

12 | Defendants' ongoing business practices have resulted in dangerous conditions that

13 | threaten citizens across the country, in the State of California, and in the City of Los

14 | Angeles.

15 | 104.   In one instance, the nuisance created by Defendants proximately caused

16 | direct and special injuries to Plaintiffs—who were shot by one of Defendants'

17 | firearms while serving their community as Los Angeles County Sheriff's Deputies.

18 | Those injuries are different in kind from the above-described injuries to the general

19 | public.  Defendants' actions resulted in the shooter possessing and choosing to use a

20 | Polymer80 ghost gun, providing him the opportunity and equipment necessary to

21 | harm Plaintiffs.

22 | 105.   As a result of the actions, inactions and omissions of Defendants,

23 | Plaintiffs have suffered and will continue to suffer general, compensatory and

24 | consequential damages.

25 | **REQUESTED RELIEF**

26 | WHEREFORE, the Plaintiffs respectfully request that this Court enter

27 | judgment in their favor and that the Court award the following relief:

28 | a)      Noneconomic damages according to proof at trial;

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

29

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1    b)    Economic damages according to proof at trial;

2    c)    Pre-judgment and post-judgment interest in accordance with California

3  law;

4    d)    Punitive and exemplary damages in an amount sufficient to punish and

5  deter Defendants' conduct;

6    e)    Costs of suit and attorneys' fees to the fullest extent permitted by law;

7    f)    Such other relief as the Court may deem just and proper.

8

9  Dated:  August 9, 2021                WALKUP, MELODIA, KELLY & SCHOENBERGER

10

11                                 By: _____

12                                   RICHARD H. SCHOENBERGER
                                     SPENCER J. PAHLKE
13                                   SARA M. PETERS
                                     Attorneys for Plaintiffs CLAUDIA
14                                   APOLINAR and EMMANUEL PEREZ-
                                     PEREZ
15

16                                   ERIC TIRSCHWELL*
17                                   LEN KAMDANG*
                                     EVERYTOWN LAW
18
                                     Attorneys for Plaintiffs CLAUDIA
19                                   APOLINAR and EMMANUEL PEREZ-
                                     PEREZ
20                                   *Motions for admission *pro hac vice*
21                                   forthcoming

22

23

24

25

26

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

30

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1

<u>DEMAND FOR JURY TRIAL</u>

2

Plaintiffs hereby request a trial by jury.

3

4

Dated: August 9, 2021

WALKUP, MELODIA, KELLY & SCHOENBERGER

5

6

By:

7

RICHARD H. SCHOENBERGER
SPENCER J. PAHLKE

8

SARA M. PETERS

9

Attorneys for Plaintiffs CLAUDIA
APOLINAR and EMMANUEL PEREZ-

10

PEREZ

11

ERIC TIRSCHWELL*
LEN KAMDANG*

12

EVERYTOWN LAW

13

Attorneys for Plaintiffs CLAUDIA

14

APOLINAR and EMMANUEL PEREZ-
PEREZ

15

*Motions for admission *pro hac vice*

16

forthcoming

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

31

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

**FILED**
Superior Court of California
County of Los Angeles
08/20/2021
Sherri R. Carter, Executive Officer / Clerk of Court
By: _____ J. Salazar-Menjivar _____ Deputy

LAW OFFICES OF

**WALKUP, MELODIA, KELLY & SCHOENBERGER**
A PROFESSIONAL CORPORATION

650 CALIFORNIA STREET, 26TH FLOOR
SAN FRANCISCO, CALIFORNIA 94108–2615
T: (415) 981–7210 · F: (415) 391–6965

RICHARD H. SCHOENBERGER (State Bar #122190)
rschoenberger@walkuplawoffice.com
SPENCER J. PAHLKE (State Bar #250914)
spahlke@walkuplawoffice.com
SARA M. PETERS (State Bar #260610)
speters@walkuplawoffice.com

EVERYTOWN LAW
Eric Tirschwell (motion for admission *pro hac vice* pending)
etirschwell@everytown.org
Len Hong Kamdang (motion for admission *pro hac vice* pending)
lkamdang@everytown.org
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
(mailing address)
Telephone: (646) 324-8222
Facsimile: (917) 410-6932

**ATTORNEYS FOR PLAINTIFFS**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| CLAUDIA APOLINAR and EMMANUEL PEREZ-PEREZ, <br><br> Plaintiffs, <br><br> v. <br><br> POLYMER80, INC., a Nevada corporation, and DOES ONE through FIFTY, <br><br> Defendants. | Case No. 21STCV29196 <br><br> **FIRST AMENDED COMPLAINT FOR DAMAGES** <br><br> JURY TRIAL DEMANDED |

## <u>INTRODUCTION</u>

1.     This case is about the unlawful and negligent sale of an untraceable home-assembled "ghost gun" kit that resulted in the September 2020 ambush

Electronically Received 08/20/2021 10:27 AM

1  shooting of Los Angeles County Sheriff's Deputies Claudia Apolinar and Emmanuel

2  "Manny" Perez-Perez, each of whom sustained multiple severe wounds.

3      2.      On the evening of September 12, 2020, Sheriff's Deputies Apolinar and

4  Perez-Perez (hereafter "Perez") were on a routine shift sitting in a marked patrol

5  cruiser near the Martin Luther King Jr. Transit Center in Compton, CA.

6      3.      A man dressed in black shorts, a grey sweater, and armed with a

7  Polymer80 ghost gun pistol silently approached the passenger side window of their

8  patrol cruiser under cover of night. Without warning, he ambushed them.

9      4.      Deputy Apolinar was seated in the driver's seat. The first indication she

10  had of an attack was the sound of shots coming from her assailant's Polymer80 pistol

11  at point blank range. She immediately felt a searing, warm pain. She tried to radio

12  for help but could not speak. She would later learn that one of multiple gunshot

13  injuries she suffered was to her jaw. She could not speak because the shooter's bullet

14  had sliced apart her tongue.

15      5.      For Deputy Perez, the first indication of an attack was a glimpse of

16  movement out of the corner of his eye. Before he could react, he heard the sound of

17  gunfire – four shots – and saw the flash of the muzzle. He immediately tried to call

18  for help but his radio, which he later learned was struck by a bullet, was inoperable.

19  He tried to open his door to defend himself against the attacker but found he was

20  unable to use his hands. One of his multiple gunshot wounds was in his right arm.

21      6.      After both Deputies were shot, Deputy Perez was eventually able to

22  open the door with his left hand. He first tried to determine whether the shooter had

23  fled the scene. He attempted to apply a tourniquet to his own bleeding arm but was

24  unable to. He then scrambled around the hood of the car to the driver's side and saw

25  that his partner Deputy Apolinar had been shot in the face. Together, they hid

26  behind a pillar, as they were unsure of the shooter's location. Deputy Apolinar

27  examined her partner's wounds and applied a tourniquet to his arm. Deputy Perez

28  realized that his partner's radio was activated but that she could not speak. Using

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA  STREET
26TH  FLOOR
SAN  FRANCISCO,  CA   94108
(415)  981–7210

2

1   his partner's radio, he called for help. The two of them waited until other Sheriff's

2   Deputies arrived and transported them to the hospital.

3        7.     Days later, during a pursuit of a carjacker, the suspect – Deonte Murray

4   (the "shooter") – discarded a gun that was matched by ballistics to the ambush of

5   Deputies Apolinar and Perez.

6        8.     The shooter was charged with attempted murder, assault with a deadly

7   weapon, and being a convicted felon illegally in possession of a firearm, among other

8   crimes.

9        9.     The shooter was a California resident who had a history of prior felony

10   convictions that made it illegal for him to purchase or possess firearms, including

11   convictions for firearm possession, sale and possession of narcotics, receiving stolen

12   property, and burglary and terrorist threats.

13        10.    At all relevant times, Polymer80, Inc. ("Polymer80") and Does One

14   through Fifty (collectively "Defendants") – manufactured, advertised, and sold

15   firearm kits that included some or all the components necessary to quickly and easily

16   build complete and fully functional frames and weapons, including Glock-style semi-

17   automatic handguns like the one used to ambush Plaintiffs.

18        11.    These do-it-yourself firearms are commonly known as "ghost guns"

19   because they lack serial numbers and are therefore extremely difficult, if not

20   impossible, for law enforcement to trace when recovered in connection with criminal

21   investigations.

22        12.    Because a central purpose of ghost guns is that they are untraceable, it

23   is difficult and often impossible to determine with certainty who manufactured, sold,

24   purchased, or transferred a particular ghost gun. Nevertheless, the firearm used in

25   the attack of Deputies Apolinar and Perez has been identified as a Polymer80

26   handgun, model PF940c. Upon information and belief, the firearm had no serial

27   number and bore no identifying characteristics save for a "P80" logo—the insignia of

28   Defendant Polymer80—stamped on the gun.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA  STREET
26TH  FLOOR
SAN  FRANCISCO,  CA   94108
(415)  981-7210

3

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

13.     Upon information and belief, the unserialized Polymer80 firearm used in the ambush attack of Sheriff's Deputies Apolinar and Perez was originally purchased as a kit in California from either Polymer80 or one of Polymer80's third party distributors, who sold it without performing a background check.

14.     Defendants sold Polymer80 ghost gun kits without serial numbers and without taking reasonable steps to ensure that purchasers are legally allowed to purchase or possess firearms, despite knowing that their deadly products are especially attractive to criminals and would likely and foreseeably end up in the hands of dangerous persons prohibited from legally owning firearms under federal and state law.  Furthermore, Defendants did not take reasonable steps to ensure that law enforcement could trace their assembled firearms if they were used in crimes. In fact, Defendants purposefully sold their products without markings to make it difficult for law enforcement to trace the firearm.  Defendants knew and could foresee – but consciously disregarded the risk – that they were creating and contributing to a direct and secondary market for illegal, unserialized and untraceable guns, knowing that their firearms were likely to end up in the hands of criminals and were likely to be used for criminal purposes like the ambush shooting of the Plaintiffs.

15.     The proliferation of ghost guns has become a nationwide public health emergency, as these firearms have increasingly become weapons of choice for criminals. According to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), from 2016 to 2020 there were approximately 23,906 suspected privately made ghost guns reported to ATF as having been recovered by law enforcement from potential crime scenes, including 325 homicides or attempted homicides.[1]

_____

[1] May 21, 2021 Proposed Rule Docket No. ATF 2021R-05, Federal Register Vol. 86, No 97 at 27722 *available at* https://www.govinfo.gov/content/pkg/FR-2021-05-21/pdf/2021-10058.pdf (last accessed August 6, 2021)(hereafter "Proposed Rule").

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA  STREET
26TH  FLOOR
SAN  FRANCISCO,  CA   94108
(415)  981–7210

4

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

16.     The proliferation of ghost guns has been an especially severe problem in California and Los Angeles in particular.  In recent years, nearly 33% of all firearms recovered from federal criminal investigations across California lacked serial numbers.[2]  In the Los Angeles area, the ATF has stated that over 40% of its recoveries are ghost guns.[3]

17.     According to public reports and legal filings, Polymer80 is by far the largest seller and manufacturer of ghost gun kits and components. For example, of approximately 1,475 ghost guns seized in 2019 and entered into the ATF's database of ballistic images, over 86% (1,278) were assembled from Polymer80 components.[4]  In 2020, the LAPD recovered over 700 firearms with Polymer80 components during the course of criminal investigations.

18.     Polymer80 is currently under federal criminal investigation for its sale of ghost gun kits.  In December 2020, the ATF executed a search warrant at Polymer80's Nevada headquarters as part of its investigation into Polymer80's sales of all-in-one "Buy Build Shoot Kits," from which purchasers can quickly and easily assemble their own Glock-style semi-automatic handguns – the same type of firearm used in the ambush shooting of Deputies Apolinar and Perez.[5]

19.     Polymer80's core products—gun building kits that are quickly and easily assembled into operable weapons—fall under the definition of "firearm" and, in certain instances, "handgun" under federal law.  Therefore, Polymer80's business practice of selling gun building kits without serial numbers, without conducting

---

[2] Alain Stephens, Ghost Guns Are Everywhere in California, THE TRACE (May 17, 2019), https://www.thetrace.org/2019/05/ghost-gun-california-crime/.

[3] Brandi Hitt, Ghost Guns' Investigation: Law Enforcement Seeing Unserialized Firearms on Daily Basis in SoCal, ABC7 LOS ANGELES (January 30, 2020), https://abc7.com/5893043/.

[4] Affidavit of ATF Special Agent Tolliver Hart, *In the Matter of the Search of the Business and Federal Firearms Licensee known as Polymer80, which is located at 134 Lakes Blvd., Dayton, NV 89403*, 3:20-mj-123-WGC, ¶ 28(e) (D. Nev. Dec, 9, 2020)(hereafter "ATF Affidavit").

[5] ATF Affidavit at ¶ 28(c).

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA  STREET
26TH  FLOOR
SAN  FRANCISCO,  CA   94108
(415)  981-7210

1    background checks, and to purchasers residing in a different state, is illegal under

2    federal law.

3        20.    Defendants have also violated California law by aiding and abetting the

4    manufacture of handguns that fail to comply with (a) the safety requirements of

5    California's Unsafe Handgun Act and (b) California's certification and serial number

6    requirements.  Indeed, the ATF has stated in a search warrant application that

7    "manufacturing or assembling a firearm made with [Polymer80] pistol frames is

8    unlawful in California."[6]

9        21.    Defendants have also violated California's Unfair Competition Law in

10   multiple ways, including by falsely and misleadingly representing, expressly and by

11   implication, that it was legal to purchase and build a Polymer80 PF940c frame kit or

12   Buy Build Shoot Kit in California, when, as Defendants knew, it was not.

13       22.    Defendants created a public nuisance and acted with gross negligence,

14   recklessness, and malice towards Plaintiffs and all Californians, and acted with

15   conscious disregard for the health and safety of Plaintiffs and all Californians, by

16   creating a market that unreasonably and directly and indirectly put untraceable, no-

17   background check guns in the hands of dangerous persons, foreseeably resulting in

18   the use of its guns in criminal acts.

19       23.    By this lawsuit, Plaintiffs seek to hold Polymer80 and its principals

20   accountable for its role in facilitating and causing one particularly reprehensible

21   criminal act carried out with one of its ghost guns: the ambush shooting of Sheriff's

22   Deputies Apolinar and Perez in September 2020.

23       24.    Plaintiffs, as law enforcement officers themselves, seek accountability –

24   not only the accountability of the shooter which he will face in the context of his

25   criminal prosecution, but also the civil responsibility of those who recklessly equipped,

26   enabled, and empowered the shooter to commit his crimes.

27

28

[6] ATF Affidavit at ¶ 65, note 6

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA   94108
(415)  981–7210

## **PARTIES**

25.     Claudia Apolinar is a Los Angeles County Sheriff's Deputy, who graduated from the Los Angeles County Sheriff's Deputy Training Academy in 2019. As a college student, she took criminal justice classes from former law enforcement officers. She was inspired by their commitment to service and bravery. She loves the community where she grew up – East Los Angeles.  When her son was born, she decided to pursue work in a field where she could help ensure that the East Los Angeles area she grew up in was as safe and supportive as she remembered. Her career in law enforcement allows her to realize that vision.

26.     Emmanuel Perez is a Los Angeles County Sheriff's Deputy, who graduated in the same Sheriff's Deputy Training Academy 2019 class as Claudia Apolinar. Growing up in a working class Mexican American community, he had a number of negative experiences with law enforcement. Yet, he became a Sheriff's Deputy because he believes that police officers can play a vital role in his community. He wants to serve as a positive example of law enforcement in his city.  As a Los Angeles County Sheriff's Deputy, he has always been committed to treating everyone he meets fairly and with dignity and respect.

27.     Defendant Polymer80, Inc. is a Nevada corporation with its principal place of business in Dayton, Nevada.  Polymer80, Inc. holds a Federal Firearms License.

28.     Defendants, and each of them, knowingly structured their business to knowingly circumvent governing federal and state laws applicable to firearms and handguns, by opting to design readily manufactured unserialized gun and frame kits and selling them without background checks.

29.     The true names and capacities, whether individual, corporate, or otherwise, of Does One through Fifty, inclusive, are presently unknown to Plaintiffs, who therefore sue them by fictitious names.  Plaintiffs shall amend the complaint to show the true names of each fictitiously named defendant when ascertained.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA STREET
26TH  FLOOR
SAN  FRANCISCO,  CA   94108
(415)  981–7210

7

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

30.     Plaintiffs allege that, in addition to acting on its own behalf, all of the acts and omissions described in this Complaint by Polymer80 were duly performed by, and attributable to, all Defendants, whether named or unnamed, with each acting as agent, ostensible agent, employee, alter ego, joint enterprise and/or under the direction and control of the others, and such acts and omissions were within the scope of such agency, ostensible agent, employment, alter ego, joint enterprise, direction, and/or control.  Any reference in this Complaint to any acts of Defendants shall be deemed to be the acts of each Defendant acting individually, jointly, or severally.

## JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction under California Code of Civil Procedure § 410.10 because Plaintiffs are domiciled in the State of California, the site of injuries was in the State of California, and the amount in controversy exceeds $25,000.

32.     The Court has personal jurisdiction over Defendants in that, at all relevant times, Defendants, and each of them, did business in the State of California, and otherwise had the requisite minimum contacts with the State to justify this Court exercising jurisdiction over them.

33.     Specifically, the Court has personal jurisdiction over Defendants because Polymer80 purposely avails itself of California markets by intentionally advertising and selling its products to California residents, both online and through its network of distributors, including through state-based distributors, thereby taking advantage of the benefits and privileges of the laws of the State of California. Shipping records obtained by ATF show that Polymer80 shipped approximately 9,400 items to customers in California between January 2019 and October 2020, including at least 202 Buy Build Shoot kits containing all the components necessary for the purchaser to quickly assemble a complete and operable firearm.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981–7210

8

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

34.    Venue is proper pursuant to California Code of Civil Procedure § 395(a) because the place of injuries and losses occurred in the city of Compton, California, which is within the County of Los Angeles.

## GENERAL ALLEGATIONS

### *The Aftermath of the Ambush Shooting*

35.    As described above, the shooter shot Sheriff's Deputy Apolinar in the jaw—shattering it and slicing her tongue in half.  For two months after the incident, her doctors prescribed her an all-liquid diet after they wired her jaw shut to heal. She continues to suffer from permanent tongue damage and weakness in her jaw. Her lower lip and chin remain numb because the nerve connecting to the lower part of her face was severed during the ambush.

36.    Deputy Apolinar was also shot in both arms and suffered broken bones in each arm. She cannot carry a gallon of milk with her right arm.

37.    Deputy Apolinar spent six days in the intensive care unit.

38.    Deputy Apolinar thinks about the ambush every day. When she came home from the hospital, her young son recoiled in fear at the sight of her because of her injuries. They are still working to rebuild their relationship. Her injuries prevent her from doing many of the activities she enjoyed with her son before the ambush. She cannot even pick him up.

39.    After the ambush, Sheriff's Deputy Perez learned that he had actually been shot a total of five times. He was shot in the head. He was also shot in the hand, resulting in a shattered bone. Another bullet entered his arm and shattered his humerus bone. Another bullet went through his shirt, skidded off his bulletproof vest, and disabled his handheld radio.

40.    Because of these injuries, Deputy Perez suffered a concussion and brain bleeding. He underwent surgery on his hand and elbow, including a bone graft from his hip.  He required three plates surgically inserted onto his humerus bone, which was broken in three places. Additionally, he now has multiple plates and

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA  STREET
26TH  FLOOR
SAN  FRANCISCO,  CA   94108
(415)  981–7210

1  screws in his hand and arm to hold the shattered bones together, and he is informed

2  that he requires additional surgery to restore function in his hand. He suffers from

3  numbness in his right hand on his index finger and running to the top of his hand.

4  He cannot lift more than ten pounds with his injured arm.

5        41.    Deputy Perez struggles with sleep every night and is receiving mental

6  health support for his trauma. He suffers from flashbacks. He had no previous

7  mental health issues before the ambush. Before his injury he loved being around his

8  family, but he now feels withdrawn and irritable for reasons he cannot explain. He

9  increasingly avoids interactions with other people.

10        42.    Neither Deputy Apolinar nor Deputy Perez has been cleared to return to

11  duty.

12        ***The Shooter***

13        43.    As noted above, the shooter is a California resident who had a history of

14  multiple prior felony convictions that made it illegal for him to purchase or possess

15  firearms.

16        44.    The shooter was able to commit the ambush shooting of the Deputies

17  because Defendants' deliberate and reckless acts created a direct and secondary

18  market that foreseeably provided prohibited persons like the shooter with easy access

19  to unserialized ghost guns assembled from kits and purchased without any

20  background check.

21        45.    Upon information and belief, the shooter chose to shoot the Deputies

22  with this Polymer80 ghost gun in substantial part because he knew it was

23  unserialized and untraceable by normal means.

24        ***Ghost Gun Basics***

25        46.    A firearm made by a federally licensed manufacturer must be engraved

26  with identifying information: a unique serial number, as well as the make and model.

27  A ghost gun is a do-it-yourself, homemade gun made from commercially available

28  building blocks. It is assembled by an individual rather than by an ATF-licensed

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA  STREET
26TH  FLOOR
SAN  FRANCISCO,  CA   94108
(415)  981–7210

10

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

manufacturer or importer.  A ghost gun has three key, related characteristics:  it is unserialized, it is virtually untraceable, and its core building blocks (the frame for a handgun, or the receiver for a rifle) are acquired without a background check.

47.     In a pistol (such as a Glock 17, pictured below), the frame provides the basic bottom outline of the gun, housing the trigger and the magazine, while providing a foundation for the slide and barrel (i.e., the parts a bullet passes through when fired and from which cartridges are ejected).



48.     Most ghost guns are made from "unfinished" frames and receivers, which means they lack machine marking or drilling in certain specified areas (typically, the fire control cavity or trigger area).  Unfinished frames and receivers are often marketed as "80%" complete, such that a buyer needs to do only a small percentage of the work—typically, drilling out certain parts—for the frame or receiver to be "finished" and then assembled into an operable firearm.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

11
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

*The sale of ghost guns has created an urgent and continuing public safety emergency*

49.     The sale of ghost gun kits undermines sixty years of federal law directed at preventing dangerous persons from possessing firearms and assisting law enforcement in tracing firearms.  In 1968, amid rising rates of violent crime and following several high-profile assassinations—including the killing of President Kennedy with a rifle ordered through the mail—Congress passed landmark legislation to assert federal control over the manufacturing, distribution, purchase, and sale of firearms.  One of the principal aims of the Gun Control Act of 1968 (the "Act") was to eliminate the ability of criminals, minors, and persons with dangerous histories to obtain mail-order firearms without any federal oversight or regulation. To achieve this aim, the Act mandated that firearms dealers be federally licensed and that every firearm be stamped with a serial number so that law enforcement could trace the origin of the firearm if it ended up being used in a crime.  The Act was later amended to require a background check on all purchases of firearms from licensed sellers.

50.     Typically, when police recover a firearm, they use the included serial number and other markings to initiate a trace request through the ATF.  By tracing a gun back to its first sale at retail, law enforcement agencies gain an additional lead in an investigation, identify straw purchasers and traffickers, and figure out how a gun arrived at a crime scene.

51.     As noted above, because they are unserialized, ghost guns are intended to be, and often are, untraceable back to their original purchaser or subsequent transferees.  Ghost guns have no recorded history and no records associated with them.  The untraceability of ghost guns is one of their selling points and makes them attractive to criminals and gun traffickers trying to avoid responsibility when their guns are recovered by law enforcement.  As one federal appellate court has explicitly noted in the analogous context of handguns with obliterated serial numbers, "[t]here

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA  STREET
26TH  FLOOR
SAN  FRANCISCO,  CA   94108
(415)  981–7210

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

1   would appear to be no compelling reason why a law-abiding citizen would prefer an

2   unmarked firearm.  These weapons would then have value primarily for persons

3   seeking to use them for illicit purposes."[7]  Sellers of ghost gun kits take the work out

4   of obliterating a serial number and directly and indirectly supply and create a direct

5   and secondary market for such illicit users.

6        52.    Since 2014, sellers of ghost gun kits have proliferated over the internet,

7   with scores of such sellers distributing them during the relevant time period.  These

8   unserialized and nearly complete firearms are often purchased by or otherwise end

9   up in the hands of people who are prohibited from possessing firearms because of

10   age, dangerous mental health history, or criminal history – individuals who are

11   attracted by the ability to purchase nearly complete guns without a background

12   check.

13       53.    Once assembled, ghost guns continue to be especially attractive – and

14   are often sold or transferred – to criminals, who place a high premium on firearms

15   that are untraceable and come with no traceable history of use in prior crimes.

16       54.    The number of ghost guns recovered by law enforcement throughout the

17   country has increased in recent years. As noted above, from January 1, 2016 through

18   December 31, 2020, there were approximately 23,906 suspected ghost guns reported

19   to ATF as having been recovered by law enforcement from potential crime scenes,

20   including 325 homicides or attempted homicides, and that were attempted to be

21   traced by ATF. They are broken down by year as follows:

22       a.    2016: 1,750

23       b.    2017: 2,507

24       c.    2018: 3,776

25       d.    2019: 7,161

26

27   _____

28   [7] *United States v. Marzzarella*, 614 F.3d 85, 95 (3d Cir. 2010).

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981–7210

13
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

1      e.      2020: 8,712[8]

2      55.      The trend in California is consistent with these national numbers. ATF

3 has estimated that about 2,700 ghost guns were recovered in California in 2019.[9]

4 And as noted above, in 2020, LAPD recovered over 700 firearms with Polymer80

5 components during the course of criminal investigations. Nearly 300 such firearms

6 were recovered from LAPD's South Bureau, which covers south Los Angeles –

7 including the Compton neighborhood where the Plaintiff Deputies were ambushed

8 and shot. LAPD reports that the proportion of recovered firearms that are ghost guns

9 is increasing.  In other words, more and more, criminals are choosing ghost guns to

10 commit crimes.

11      56.      Other horrific examples of ghost gun crimes in California abound.  In

12 November 2019, a 16-year-old student at Saugus High School in Santa Clarita

13 brought a home-assembled ghost gun to school and used it to shoot five of his

14 classmates, killing two before turning the gun on himself.  In May of 2020, two far-

15 right anti-government activists used a ghost gun to murder a security officer for the

16 Oakland federal courthouse and a Sheriff's Deputy in Santa Cruz. A ghost gun built

17 from Polymer80 components was used during a 2019 home invasion robbery and

18 murder of three persons in Glendale. Two ghost guns recovered near the scene of a

19 November 2020 murder in Glendale, carried out by members of the Gardena 13

20 street gang, were built with Polymer80 model PF940C components.[10]

21      57.      The grim, foreseeable, and inevitable result of the reckless and

22 negligent sale of ghost gun kits is the police increasingly finding these dangerous,

23 untraceable weapons at crime scenes.

24

25

26

_____

27 [8] Proposed Rule at 27722-3.

[9] ATF Affidavit at ¶ 28(b).

28 [10] ATF Affidavit  at ¶¶ 28b, 28d.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA  STREET
26TH  FLOOR
SAN  FRANCISCO,  CA   94108
(415)  981–7210

14

### Defendant Polymer80 is Largely Responsible for the Proliferation of Ghost Guns

58.     As alleged above, law enforcement statistics show that an overwhelmingly large percentage of the ghost guns recovered nationwide at crime scenes were assembled from Polymer80's products, and the same is true in California and Los Angeles.

59.     In fact, at all relevant times, California was Polymer80's largest state market for its unfinished frame and receiver kits.

60.     At all relevant times, Polymer80 sold untraceable firearm kits and components without first conducting background checks or taking other reasonable steps to ensure the purchaser was eligible to buy a gun—foreseeably resulting in purchase by and transfer to persons who cannot legally obtain a serialized, traceable weapon from a licensed dealer, and to persons for whom such a weapon is particularly desirable for use in unlawful acts.

61.     At all relevant times, Polymer80 offered "Buy Build Shoot" kits—which, until recently,[11] were sold directly by Polymer80 before Polymer80 ceased sales, and which are still being offered for sale by resellers.[12]  With one of these kits, a purchaser could obtain a nearly finished Glock-type semiautomatic pistol—the precise firearm used in the ambush on Plaintiffs – and quickly and easily assemble it into a completed, operable firearm. Polymer80's website described these kits as

---

[11]  Polymer80 advertised these kits as recently as December 12, 2020.  *See* "Polymer80 BBS™ Kits," Polymer80, archived webpage from Dec. 12, 2020, *available at* https://web.archive.org/web/20201212165741/https://www.polymer80.com/pistols/bbskits (last visited July 19, 2021).

[12]  Although Polymer80's Buy Build Shoot kits are not currently advertised for sale on Polymer80's own website, they are still being advertised for sale on some resellers' websites.  *See, e.g.,* https://www.armorally.com/shop/polymer80-pf940c-g19-buy-build-shoot-kit/ (last visited August 6, 2021).

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981–7210

1    "contain[ing] all the necessary components to build a complete PF940C™ or

2    PF940v2™ pistol."[13] A Polymer80 Buy Build Shoot kit can be completed into a

3    functioning firearm in under thirty minutes.[14]  Such a kit is designed to be and may

4    readily be converted into an operable weapon.  It also is a combination of parts from

5    which a firearm which has a short stock and is designed to be held and fired by the

6    use of a single hand can be assembled.

7          62.    The images below are screenshots of a cached Polymer80 webpage from

8    December 11, 2020 relating to the Buy Build Shoot kit.



23         63.    In addition to the full Buy Build Shoot kits, at all relevant times

24   Polymer80 advertised and sold frame kits for handguns and lower receiver kits for

25

26   [13]  Polymer80, archived webpage from Dec. 12, 2020, *available at*

27   https://web.archive.org/web/20201212165927/https://www.polymer80.com/P80-Buy-
     Build-Shoot-kit-PF940v2-10-Round-Magazine-Gray (last visited July 19, 2021).

28   [14] Proposed Rule at FN54.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA  STREET
26TH  FLOOR
SAN  FRANCISCO,  CA    94108
(415)  981–7210

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

1   AR-15 and AR-10 style rifles.[15]  These unfinished frame and receiver kits are

2   designed to be, and can quickly and easily be converted into, working frames and

3   receivers that form the core component of a functioning firearm. As of July 19, 2021,

4   Polymer80 was still advertising the sale of these frame kits and lower receiver kits

5   through its website.[16] Polymer80's pistol frame kits were at all relevant times sold

6   with a "complete finishing jig and drill bits," as illustrated in the figure below, which

7   is a screenshot of a Polymer80 webpage, taken on February 14, 2021, showing a

8   Polymer80 80% pistol frame kit for sale.



19       64.    At all relevant times, Polymer80 also sold other components to enable

20   customers to assemble a complete handgun, including pistol barrels, slides, and

21   trigger assemblies.

22       65.    Beyond selling these products, at all relevant times Polymer80

23   substantially assisted the assembly of these firearms by offering written step-by-step

---

[15] "P80 80% Pistol Frame Kits," Polymer80, *available at*
https://www.polymer80.com/pistols/80percentpistolkits (last visited July 19, 2021);
"80% AR Receiver Kits," Polymer80, *available at*
https://www.polymer80.com/arreceivers (last visited July 19, 2021).

[16] *Id.*

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA  STREET
26TH  FLOOR
SAN  FRANCISCO,  CA   94108
(415)  981-7210

17
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

1   assembly instructions online, accompanied by supplemental videos, to facilitate the

2   manufacture of both pistols and semi-automatic rifles in a matter of a few hours or

3   less.  Polymer80 even touted its superior customer service that is on standby to assist

4   its customers in manufacturing firearms from its kits.  "We want to give the

5   customers all the tools they need, as much as we can anyway, to complete this

6   product."[17]

7        66.    By selling kits and all the component parts together with the means to

8   quickly, easily, and readily convert the kits and parts into operable firearms,

9   Polymer80 effectively put firearms into circulation while subverting regulations that

10  apply to the sale of firearms. This uniquely dangerous method of distribution placed

11  the public at risk and allowed and attracted dangerous prohibited users—like the

12  shooter who ambushed Plaintiffs—to obtain their products for use in violent crime.

13       67.    Defendants' sales practices make a mockery of federal and state

14  background check laws. Before completing each sale, Defendants not only failed to

15  conduct formal background checks or require its distributors/resellers to do so, on

16  information and belief, Defendants asked direct retail customers to merely "self-

17  certify" that they do not have a felony record. By doing so, Defendants knowingly

18  flouted federal and state law by projecting compliance through an utterly ineffective

19  system. Not surprisingly, ATF has confirmed that Polymer80, or a reseller, sold Buy

20  Build Shoot kits to addresses in California where individuals with felony convictions

21  resided.[18]

22       68.    Polymer80 was sued on June 24, 2020, by the Attorney General for the

23  District of Columbia for illegally selling ghost gun frame and receiver kits into the

24  District of Columbia.  That lawsuit put Polymer80 on notice that in 2017, the District

25  recovered three ghost guns, followed by 25 in 2018, and 116 in 2019; that the District

26

27  [17] Shooters Nation, *020 Dan McCalmon of Polymer 80*, YOUTUBE (Aug. 10, 2018),
    *available at* https://www.youtube.com/watch?v=nybZ3iNfUhU.

28  [18] ATF Affidavit at ¶ 87.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA  STREET
26TH  FLOOR
SAN  FRANCISCO,  CA   94108
(415)  981–7210

18

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

1   was on track to set a new record in 2020, with 106 ghost guns recovered between

2   January 1 and May 29 alone; that of the 250 ghost guns recovered since 2017, 208

3   were produced by Polymer80; and that Polymer80 handguns had been recovered in

4   connection with nine homicides in the District.

5        69.    The shooter was within the class of foreseeable users, and indeed was

6   part of the intended market, for Defendants' ghost gun kits, even though federal and

7   California law prohibited the shooter from purchasing, owning or possessing firearms

8   because of his prior felony criminal history.

9        70.    Defendants' method of distribution and marketing—direct to purchasers

10   with no formal background check necessary and untraceable to the authorities, and

11   indirect through resellers without a serial number or any reasonable measures to

12   ensure sales only to eligible purchasers—was foreseeably attractive to a person with

13   the shooter's background. Prior to the ambush, Defendants knew that this means of

14   distribution and marketing would be particularly attractive to prohibited users like

15   the shooter.

16        71.    Defendants nevertheless disregarded the foreseeable risk that their

17   reckless marketing, sales, and distribution of unserialized ghost gun kits and parts

18   would cause their products to end up in the hands of dangerous prohibited users to

19   ultimately be used in crimes. They took no reasonable steps to prevent their product

20   from ending up in the hands of prohibited individuals like the shooter. The shooter

21   was able to obtain one of Defendants' firearm kit products and chose to ambush

22   Deputies Apolinar and Perez with a Polymer80 firearm in substantial part because

23   Defendants disregarded these foreseeable risks.

24   **I.    DEFENDANTS' UNLAWFUL ACTS**

25       **A.    The Federal Gun Control Act**

26        72.    The Federal Gun Control Act (the "Gun Control Act"), 18 U.S.C. §

27   921(a)(3) (emphasis added), provides:

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415)  981–7210

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

> The term "firearm" means (A) any weapon (including a starter gun) which will or is **designed to or may readily be converted** to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device.  Such term does not include an antique firearm.

73.     At all relevant times, Polymer80 sold Buy Build Shoot kits consisting of all component parts of a firearm, including unfinished handgun frames, which are "designed to" be and "may readily be converted" into an operable weapon.  At all relevant times Polymer80 also sold frame and receiver kits containing an unfinished "frame" or "receiver" along with jigs and drill bits designed to enable a customer to complete the frame or receiver.  These too are "designed to" be and "may readily be converted" into the finished frame or receiver of an operable weapon. Accordingly, Polymer80 knowingly sold "firearms" under § 921(a)(3). In fact, in applying for a warrant to search Polymer80's premises, the ATF represented to a federal court that "ATF Chief Counsel has ... determined that the Buy Build Shoot kits are, as a matter of law, firearms pursuant to 18 U.S.C. section 921(a)(3)."[19]

74.     Because the kits that Polymer80 sold are firearms under federal law, a number of requirements and obligations arise.  As noted above, federal law requires that firearm sellers obtain a federal firearm license ("FFL") prior to engaging in the business of dealing in firearms, *see* 18 U.S.C. § 922(a)(1), and prohibits the shipment by an FFL of a firearm directly to a purchaser, § 922(a)(2), or sale or delivery of a firearm by a seller with a FFL to a person residing in another state, § 922(b)(3). Federal law also requires that firearms dealers and manufacturers conduct a background check before transferring firearms, and that manufacturers inscribe serial numbers on all firearms.[20]  Finally, federal law prohibits selling a firearm to

---

[19]   ATF Affidavit at ¶ 65, note 6.

[20]   18 U.S.C. §§ 922(t)(1) and 923(i). Polymer80 is federally licensed to manufacture firearms, and is therefore subject to the requirements for "licensed manufacturers" set forth in 18 U.S.C. § 922 *et seq*.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

20
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

1  any purchaser who does not appear in person unless the purchaser submits an

2  affidavit as to the legality of the purchase from the seller along with a copy of a

3  notification to local law enforcement and acknowledgement of receipt of the

4  notification, § 922(c).

5      75.    At all relevant times, Defendants knowingly sold firearms in the form of

6  ghost gun kits without serial numbers and without conducting or requiring

7  background checks or other reasonable steps to ensure eligibility to purchase a gun.

8  Defendants also sold and shipped kits directly to purchasers who did not either

9  appear in person or submit an affidavit as to the legality of the purchase along with a

10  copy of notification to local law enforcement. Finally, Defendants, based in Nevada,

11  knowingly sold and delivered firearms to purchasers residing in other states,

12  including California.

13      76.    Defendants' above-described business practices and failures to comply

14  with federal firearm statutes and regulations were a proximate cause of the injuries

15  sustained by Plaintiffs when they were ambushed, as well as of the overall increase

16  in ghost gun-related shootings and ghost gun-related criminal activity in California

17  and the Los Angeles area.

18              **B.      The California Unsafe Handgun Act**

19      77.    In 1999, California passed the Unsafe Handgun Act ("CUHA"), Cal.

20  Penal Code sections 31900, et seq., to establish safety standards for all handguns

21  manufactured, imported, and sold in the state.

22      78.    The primary enforcement clause of CUHA requires that "[a] person in

23  this state who manufactures or causes to be manufactured, imports into the state for

24  sale, keeps for sale, offers or exposes for sale, gives, or lends an unsafe handgun shall

25  be punished by imprisonment in a county jail not exceeding one year."[21]

26

27

28

---

[21] Cal. Penal Code § 32000(a).

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA  STREET
26TH  FLOOR
SAN  FRANCISCO,  CA   94108
(415)  981–7210

21

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

79.     Moreover, CUHA's certification requirement mandates that "[e]very person who imports into the state for sale, keeps for sale, or offers or exposes for sale any firearm shall certify under penalty of perjury and any other remedy provided by law that every model, kind, class, style, or type of pistol, revolver, or other firearm capable of being concealed upon the person that the person imports, keeps, or exposes for sale is not an unsafe handgun[.]"[22]

80.     An "unsafe handgun" is defined as "any pistol, revolver, or other firearm capable of being concealed upon the person" that does not have certain safety devices, meet firing requirements, or satisfy drop safety requirements.[23] An "unsafe handgun" also includes, for firearms manufactured after a certain date and not already listed on the roster of handguns tested and determined by the Department of Justice not to be unsafe, handguns that lack a chamber load indicator and magazine disconnect mechanism.

81.     Upon information and belief, Polymer80-assembled handguns, originally sold by Defendants as kits, do not comply with CUHA because, among other reasons, they do not meet CUHA's chamber load indicator and magazine disconnect mechanism requirements.

82.     As mentioned, CUHA charges the California Department of Justice with compiling and maintaining a roster of handguns that have been tested and determined not to be unsafe, and therefore, "may be sold in this state."[24]

83.     The kits sold by Defendants intended to be assembled into handguns and the assembled Polymer80 handguns – like the Polymer80 PF940c used to shoot

---

[22] Cal. Penal Code § 32005(b).

[23] Cal. Penal Code § 31910.

[24] Cal. Penal Code § 32015; *Nat'l Shooting Sports Foundation, Inc. v. State of California*, 6 Cal. App. 5th 298 (2016).

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981-7210

1   the Plaintiffs – are not listed on the Roster of Certified Handguns maintained by the

2   State of California.[25]

3       84.   At all relevant times, Defendants knowingly aided and abetted the

4   manufacture of handguns that do not meet the safety requirements of CUHA by

5   marketing, selling, and transferring all of the components, parts, materials, tools,

6   instructions and instructional videos needed to build an unsafe handgun in the state.

7       85.   Defendants' actions in aiding and abetting the manufacture of unsafe

8   handguns in California – including, on information and belief, their aiding and

9   abetting the manufacture in California of the Polymer80 PF940c handgun used to

10  shoot Plaintiffs – were a proximate cause of the injuries sustained by Plaintiffs

11  during their ambush, as well as of the overall increase in ghost gun-related shootings

12  and firearms-related illegal activity in the Los Angeles area.

13                  **C.   California's Assembly of Firearms Law**

14      86.   Under California's Assembly of Firearms Law, as of July 1, 2018, any

15  person "manufacturing or assembling a firearm" was required, prior to

16  manufacturing or assembling that firearm, to apply to the California Department of

17  Justice "for a unique serial number or other mark of identification."  For a firearm

18  "manufactured or assembled from polymer plastic," the law requires that it contain

19  "3.7 ounces of material type 17-4 PH stainless steel … embedded within the plastic

20  upon fabrication or construction with the unique serial number engraved or

21  otherwise permanently affixed in a manner that meets or exceeds the requirements

22  imposed on licensed importers and licensed manufacturers of firearms pursuant to

23  subsection (i) of Section 923 of Title 18 of the United States Code and regulations

24  issued pursuant thereto."

25      87.   A purpose of the California's Assembly of Firearms Law was to prevent

26  incidents like the shooting of Plaintiffs by confirming through an eligibility check

27  _____

28  [25] State of California Dep't. of Justice, "Handguns Certified for Sale,"
    https://oag.ca.gov/firearms/certified-handguns/search.

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA  STREET
26TH  FLOOR
SAN  FRANCISCO,  CA   94108
(415)  981–7210

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

1   that applicants for a serial number to build their own firearm are not prohibited by

2   law from owning or possessing a firearm, ensuring the serialization of all firearms,

3   and reducing the availability of unserialized firearms, which together reduce the

4   availability of firearms and unserialized firearms to prohibited persons, thereby

5   increasing the probability that individuals would be prevented or dissuaded from

6   attempting such crimes.

7        88.    Defendants knowingly sold Buy Build Shoot kits and unfinished pistol

8   frame kits that – like the assembled Polymer80 PF940c pistol used to shoot Plaintiffs

9   – do not contain a unique serial number engraved or permanently affixed as required

10  under California law.

11       89.    Defendants intentionally highlighted the unserialized, no background

12  check aspect of these firearms in their marketing even though they know that this

13  makes them particularly attractive to dangerous prohibited purchasers.

14       90.    Defendants also knew of California's requirement that any person

15  intending to manufacture or assemble their own firearm must apply for, obtain and

16  then affix a serial number; in fact, on information and belief, as of in or around

17  January 2017, Polymer80 began to include blank serialization plates in its PF940

18  unfinished frames.

19       91.    But the serialization plate included with the Polymer80 PF940

20  unfinished frames did not weigh anywhere near the 3.7 ounces required under

21  California law, and Polymer80 knew and intended that its PF940 kits would be

22  completed into operable firearms without complying with these mandates of

23  California law.

24       92.    In fact, on information and belief, there is no feasible way to finish or

25  modify the PF940 unfinished polymer plastic-based frame so that it included or was

26  able to accept or incorporate 3.7 ounces of embedded steel on which a serial number

27  could be affixed.

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA  STREET
26TH  FLOOR
SAN  FRANCISCO,  CA   94108
(415)  981–7210

24

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

93.     Polymer80 therefore knew and intended that, as of and after July 1, 2018, any PF940 pistol frame kits it sold into its largest market – California – would be completed and assembled into operable firearms that were unlawful to possess in that state.

94.     Defendants' actions of selling, aiding, and abetting the manufacture and assembly of firearms that fail to comply with California's serialization and 3.7 ounces of steel requirements – including, on information and belief, their aiding and abetting the manufacture in California of the illegal Polymer80 PF940c handgun used to shoot Plaintiffs – were a proximate cause of the injuries sustained by Plaintiffs when they were ambushed, as well as of the overall increase in ghost gun-related shootings and illegal ghost gun-related criminal activity in the Los Angeles area.

### D.     California's Unfair Competition Law

95.     California's Unfair Competition Law ("UCL"), Business and Professions Code section 17200, provides that "[a]s used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

96.     Defendants violated the UCL by engaging in unlawful business activities, including the violations of federal and state law described above.

97.     Defendants also violated the UCL by committing unfair and fraudulent business acts and by engaging in unfair, deceptive, untrue and misleading advertising.

98.     In advertising and selling its Buy Build Shoot and pistol frame kits to California residents while representing that ATF determination letters classified those kits as not being firearms, Defendant expressly and by implication represented that these products are legal to build and own, which they are not, and that ATF has said so with respect to Polymer80's frame kits, which it has not.

99.     From in or around 2017 or earlier until in or around June 2020 or later, Polymer80 stated on the homepage of its website, directly underneath a picture of an

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981–7210

25

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

1   "80% PISTOL FRAME": "Is it Legal?  YES!  The Polymer80 G150 unit is well within

2   the defined parameters of a 'receiver blank' defined by the ATF and therefore has not

3   yet reached a stage of manufacture that meets the definition of firearm frame or

4   receiver found in the Gun Control Act of 1968 (GCA)."  Below this text was a link to

5   an ATF determination letter concluding that an unfinished AR-15 type receiver

6   casting was not a firearm receiver or a firearm.  (The "G150" reference thus appears

7   to be to an unfinished AR-15 -style unfinished receiver sold by Polymer80.) A 2019

8   version of this webpage appeared as follows:



26   100.   Elsewhere on Polymer80's website and at all relevant times, in the Q&A

27   section, Polymer80 posed and answered questions, including "Q: May I lawfully make

28   a firearm for my own personal use, provided it is not being made for resale?," and "Q:

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA   94108
(415) 981-7210

26
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

1   Is it legal to assemble a firearm from commercially available parts kits that can be

2   purchased via internet or shotgun news?"  Polymer80 answered these questions by

3   quoting from the ATF's website, clearly implying that the answer was "Yes," without

4   any qualifications.

5         101.   Defendant made all of these statements about the lawfulness if its

6   products despite knowing that California was its largest consumer market and

7   knowing that, once finished and assembled into operable pistols, Polymer80's PF940

8   kits would not – indeed, could not – be in compliance with California gun laws for the

9   reasons described above.

10        102.   Defendant affirmatively and broadly stated on its website that such kits

11   were legal and also implied the same, without ever disclosing to California

12   consumers and omitting mention of any or all of the above-described, highly material

13   requirements of California law.[26]

14        103.   In addition, although the ATF provided determination letters to

15   Polymer80 between 2015 and 2017 concluding that certain Polymer80 unfinished

16   pistol frames and lower receivers *standing alone* were not "sufficiently complete to be

17   classified as the frame or receiver of a firearm," including the PF940C standalone

18   unfinished frame, the ATF has made no such determination that the frame *kits* and

19

20

21

22  [26] Beginning in or around July 2020, shortly after being sued the prior month by the
Attorney General of the District of Columbia for unfair and misleading business

23  practices, Polymer80 modified its website homepage to read: "Is it legal? The
Polymer80 G150™, RL556v3™ and PF-Series™ 80% Frames are well within the

24  defined parameters of a 'receiver blank' defined by the ATF and therefore has not yet
reached a stage of manufacture that meets the definition of firearm frame or receiver

25  found in the Gun Control Act of 1968 (GCA). As always Polymer80 advises
EVERYONE to check with their local state laws prior to making a purchase on our

26  website, as they may differ from federally allowed regulations."  Below this text was
a link to 3 different ATF determination letters, concluding that certain unfinished

27  frames and receivers – standing on their own – were not firearms under federal law.

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA  STREET
26TH  FLOOR
SAN  FRANCISCO,  CA   94108
(415)  981-7210

27

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

1   Buy Build Shoot Kits sold by Polymer80 are not considered firearms under federal

2   law.

3       104.   To the contrary, when Polymer80 submitted its PF940v2 unfinished

4   frame in December 2017, it hid from and failed to disclose to ATF that the PF940v2

5   would be sold as a kit with a finishing jig to guide the minimal required drilling and

6   machining, as well as the proper size drill bits, among other parts.

7       105.   ATF wrote back to Polymer80 a few months later to note that it had

8   determined that the frame was being sold as part of a pistol frame kit: "[i]t is clear

9   from the above information provided in your correspondence that the submitted

10   sample is only a component used in the assembly of an end item," and that "[c]learly

11   the submitted sample is simply a component of a larger product."

12       106.   The ATF noted in the same letter that it would "not render a

13   classification on a partial product submission."

14       107.   Instead, the ATF instructed Polymer80 to "submit the complete Polymer

15   80 Model PF940v2 80% Standard Pistol Frame Kit," if Polymer80 wanted to receive

16   an evaluation and classification of the product.

17       108.   Polymer80 never subsequently submitted the complete PF940v2 pistol

18   frame kit or any of its frame kits or Buy Build Shoot kits to the ATF for a final

19   determination as to whether such kits constituted firearms.

20       109.   Polymer80 not only continued to advertise and sell the PF940 pistol

21   frame kit for nearly three years since receiving the ATF's 2018 letter, but to

22   advertise and sell the more inclusive Buy Build Shoot Kits through at least

23   December 2020 – and continued to misrepresent, expressly and impliedly, that these

24   kits were "legal," without any qualifications or disclosures that (a) the determination

25   letters evaluated only the unfinished frames and receivers as standalone products,

26   (b) Polymer80 had hid and failed to disclose to ATF that the standalone PF940c

27   unfinished frame kit submitted for classification was sold with a jig to guide the

28   purchaser as to where to drill out the required holes (contrary to Polymer80's false

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415) 981-7210

28

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

1  and misleading statements in its letter to ATF that its unfinished frame was "void of

2  any indicators that designate or provide guidance in the completion of the firearm"),

3  and (c) the ATF's letters did not address the requirements of California law at all.

4      110.    Defendant's business practices are also unfair in violation of the UCL,

5  including because they are deceptive and sharp, threaten violations of California law,

6  violate the policy and spirit of federal and California gun laws, and have the same or

7  comparable effect as violations of those laws, all as described above.

8      111.    The California Legislature intends to regulate the sale of firearms

9  within the state, including by requiring all firearms to be marked with a unique

10  serial number.  Polymer80 violated this policy by selling frame kits that enabled

11  purchasers to assemble an unserialized Glock-style pistol – indeed, a pistol incapable

12  of satisfying California's serialization requirements as described above – instead of

13  purchasing a legal, serialized firearm or firearm kit from a licensed dealer.

14      112.    The California Legislature also charges the Department of Justice with

15  compiling and maintaining a roster of handguns that "may be sold in this state"

16  under CUHA.  Polymer80's products – even in finished form – did not appear on that

17  roster but were nonetheless sold as kits and intended to become operable firearms.

18  CUHA additionally requires that every person who offers or exposes for sale any

19  firearm shall certify under penalty of perjury that the firearm is not an unsafe

20  handgun, which Polymer80 has never done for any of its products sold.

21      113.    Defendant also engaged in business activity that is unfair to the

22  residents of California because the sale and assembly of Polymer80's Buy Build Shoot

23  kits and frame kits in contravention of state and federal law is "immoral, unethical,

24  oppressive, unscrupulous or substantially injurious to consumers," and the harm

25  caused to the People of the State of California from the proliferation of untraceable

26  ghost guns outweighs the utility of these unserialized, untraceable weapons.

27      114.    Defendants' above-described violations of the UCL, individually and

28  collectively, were a proximate cause of the injuries sustained by Plaintiffs when they

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA  STREET
26TH  FLOOR
SAN  FRANCISCO,  CA   94108
(415)  981–7210

29

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

1  were ambushed, as well as of the overall increase in ghost gun-related shootings and

2  ghost gun-related criminal activity in California and the Los Angeles area.

### CAUSES OF ACTION

### COUNT I – NEGLIGENCE

*(Against all Defendants)*

6  115.   Plaintiffs incorporate and reallege the above paragraphs as if stated

7  fully herein.

8  116.   At all relevant times, Defendants were subject to the general duty

9  imposed on all persons and entities to act reasonably not to expose others to

10  reasonably foreseeable risks of injury.

11  117.   In fact, as sellers of ghost gun kits and unfinished frames and receivers,

12  Defendants are subject to the highest duty of care because of the danger that their

13  products can cause.

14  118.   Defendants had a duty to exercise reasonable care in marketing,

15  distributing, and selling ghost gun kits and components and to refrain from engaging

16  in any activity creating reasonably foreseeable risks of injury to others.  A breach of

17  such a duty constitutes negligence.

18  119.    Defendants acted illegally, negligently, recklessly, with malice and

19  oppression, despicably, and in conscious disregard for the health and safety of others,

20  when they sold and injected into the market the firearm kit and components that

21  were thereafter finished and assembled into the operable firearm used to ambush

22  and shoot Sheriff's Deputies Apolinar and Perez.

23  120.   At all relevant times, Defendants' negligent, reckless, despicable, and

24  malicious conduct, and their conscious disregard for the health and safety of others,

25  included but was not limited to:

26  a.   Defendants knew that background checks prior to the purchase of

27  firearms and serialization of firearms were required by California and federal law.

28  Defendants knew that background checks and serialization of firearms are effective

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA  94108
(415)  981-7210

30

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

1  measures in preventing and reducing violent crimes. They knew that these were

2  important safety requirements.  At all times, Defendants knew or should have known

3  that the proliferation of ghost guns was a problem in California and was contributing

4  to criminal conduct in California. They knew or should have known that selling

5  unserialized ghost guns kits without background checks would attract would-be

6  criminals as purchasers. They knew or should have known that every Polymer80

7  pistol frame kit purchased by a California consumer to be finished and assembled

8  into an operable weapon would and could not be in compliance with – and would be

9  illegal under – California law.  They knew or should have known that selling

10  unserialized ghost gun kits without background checks would provide to felons, who

11  otherwise were prohibited from owning weapons, easy access to firearms capable of

12  inflicting great bodily injury or death. They knew or should have known that selling

13  unserialized ghost gun kits without background checks would enable, empower,

14  and/or embolden criminals to commit violent crimes that they would not otherwise

15  have committed. They knew or should have known that continued sales of firearms

16  without background checks or serialization would likely cause bodily injury and/or

17  death to innocent people, such as Plaintiffs.

18        b.     Despite their knowledge, Defendants intentionally designed,

19  constituted, packaged, marketed, advertised, and sold ghost gun kits. In fact, they

20  went even further by intentionally designing, constituting, packaging, marketing,

21  advertising, and selling ghost gun kits in such a manner as to make it easy for and

22  encourage people with no special equipment or training to quickly assemble a

23  finished and usable firearm. Defendants intentionally designed, constituted,

24  packaged, marketed, advertised, and sold ghost gun kits that were at least as

25  dangerous as a finished firearm (because of their easy conversion to a finished

26  firearm) but were misrepresented as being removed from the legal protections,

27  background checks, serialization and other safety requirements that are mandatory

28  in the context of firearm sales under federal and California law, even though

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA  STREET
26TH  FLOOR
SAN  FRANCISCO,  CA   94108
(415)  981–7210

31

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

1   Defendants knew of the serious harm this would inflict on, and which would be borne

2   by, innocent members of the public including law enforcement officers attempting to

3   combat crime.

4       c.   Despite their knowledge that their ghost gun pistol frame kits were

5   especially attractive to criminals, would not be legal to own in California once

6   completed, and that this would inevitably result in serious injury or death to

7   innocent people, Defendants encouraged and promoted their purchase by California

8   consumers and intentionally chose not to take any reasonable steps to ensure or

9   allow that its completed pistol frame kits would be in compliance with California law

10  or to verify (or require resellers to attempt to verify) that purchasers or subsequent

11  transferees were not legally prohibited from purchasing or possessing a firearm,

12  and/or unfit to safely possess a firearm.

13      d.   Defendants chose to overlook the highly foreseeable and even inevitable

14  risk that a number of those who chose to buy their ghost guns would be criminals

15  who otherwise would not have gained access to such untraceable guns, that a number

16  of those buyers would attack innocent people using the ghost guns, and that a

17  number of those attacks would result in serious injuries or deaths that otherwise

18  would not have occurred. They chose to overlook this harm, and to intentionally

19  embrace it, because they wanted to keep selling ghost guns and making money from

20  those sales. They valued their profits over the lives of innocent people, and this

21  conduct was outrageous, despicable and shocking to the conscience.

22      121.  Defendants' negligence was a direct and proximate cause of harm to

23  Plaintiffs, by causing and allowing the shooter to gain unlawful possession of a

24  Polymer80 ghost gun firearm, which he chose to use and did use to ambush Sheriff's

25  Deputies Apolinar and Perez.

26      122.  In addition, Defendants knowingly violated the requirements of federal

27  law, including violations of 18 U.S.C. § 922 and 26 U.S.C. § 5842, by selling firearms

28  without serial numbers and without conducting background checks; as well as

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650 CALIFORNIA STREET
26TH FLOOR
SAN FRANCISCO, CA 94108
(415) 981–7210

32

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

1  California firearms laws, including violations of Cal. Penal Code §§ 31900, et seq. and

2  California's Assembly of Firearms Law, by causing to be manufactured in California

3  and aiding and abetting the manufacture and possession in California of unsafe and

4  unserialized handguns, including the Polymer80 PF940c pistol used to shoot

5  Plaintiffs, and also including violations California's Unfair Competition Law, for the

6  reasons set forth above.

7  123.   The knowing violations of law by Defendants were a direct and

8  proximate cause of the injuries to Plaintiffs.  These laws are intended to protect

9  public safety by preventing the sale and transfer of unserialized firearms to

10  dangerous persons, including especially to individuals with disqualifying criminal

11  records, and preventing access to and use of unsafe and unserialized handguns across

12  the country and in California.  Defendants flouted those laws for profit, and

13  consciously disregarded the known and foreseeable risks of its business practices,

14  and in so doing, directly and proximately caused injury to Plaintiffs, who are

15  shooting victims within the class of persons these laws were designed to protect, and

16  suffered the type of harm the laws are designed to protect against.

17  124.   As a direct and proximate result of the aforementioned conduct and

18  breach of duty, Plaintiffs sustained and will sustain physical pain, mental suffering,

19  loss of enjoyment of life, anxiety, and emotional distress.

20  125.   As a direct and proximate result of the aforementioned conduct and

21  breach of duty, Plaintiffs have incurred and will continue to incur economic damages,

22  including lost future income, lost earning capacity, and past and future medical

23  expenses and related expenses.

24  126.   Accordingly, Plaintiffs are entitled to recovery against Defendants in an

25  amount to be determined at trial.

26

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA  STREET
26TH  FLOOR
SAN  FRANCISCO,  CA   94108
(415)  981–7210

33

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

**COUNT II- PUBLIC NUISANCE**

*(Against All Defendants)*

127.    Plaintiffs incorporate and re-allege the above paragraphs as if stated fully herein.

128.    Defendants created a public nuisance by marketing, selling and distributing ghost gun kits to California residents without serial numbers, without background checks, without complying with California gun laws, and without taking any reasonable steps to ensure that purchasers and transferees were not prohibited from purchasing or possessing firearms, despite knowing and consciously disregarding the risks that they were (a) creating an illegal market for ghost guns, (b) causing, promoting, and encouraging Californians to assemble firearms that were illegal to possess, and (c) directly and  indirectly distributing ghost guns to dangerous persons who are prohibited from purchasing or possessing firearms under federal and state law and who were likely to obtain and use such firearms for criminal acts and/or transfer such firearms to other prohibited persons likely to do the same. Defendants' actions have created a significant threat to the public right of health and safety in public spaces and have unreasonably interfered with public health and safety.  Defendants have facilitated the purchase and acquisition of unserialized, untraceable, unlawful guns by individuals prohibited from acquiring and possessing guns by the state and federal legislatures, and have acted in a manner that is offensive and intolerable, with malice and oppression and in conscious disregard of the health and safety of others. Defendants' ongoing business practices have resulted in dangerous conditions that threaten citizens across the country, in the State of California, and in the City of Los Angeles.

129.    In one instance, the nuisance created by Defendants proximately caused direct and special injuries to Plaintiffs—who were shot by one of Defendants' firearms while serving their community as Los Angeles County Sheriff's Deputies. Those injuries are different in kind from the above-described injuries to the general

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA  STREET
26TH  FLOOR
SAN  FRANCISCO,  CA   94108
(415)  981–7210

34

FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

1 | public.  Defendants' actions resulted in the shooter possessing and choosing to use a
2 | Polymer80 ghost gun, providing him the opportunity and equipment necessary to
3 | harm Plaintiffs.

4 |        130.   As a result of the actions, inactions and omissions of Defendants,
5 | Plaintiffs have suffered and will continue to suffer general, compensatory and
6 | consequential damages.

## REQUESTED RELIEF

8 |       WHEREFORE, the Plaintiffs respectfully request that this Court enter
9 | judgment in their favor and that the Court award the following relief:

10 |     a)     Noneconomic damages according to proof at trial;

11 |     b)     Economic damages according to proof at trial;

12 |     c)     Pre-judgment and post-judgment interest in accordance with California
13 |            law;

14 |     d)     Punitive and exemplary damages in an amount sufficient to punish and
15 |            deter Defendants' conduct;

16 |     e)     Costs of suit and attorneys' fees to the fullest extent permitted by law;

17 |     f)     Such other relief as the Court may deem just and proper.

18 | ////
19 | ////
20 | ////
21 | ////
22 | ////
23 | ////
24 | ////
25 | ////
26 | ////
27 | ////
28 | ////

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA  STREET
26TH  FLOOR
SAN  FRANCISCO,  CA   94108
(415)  981–7210

35
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

1    Dated:  August 20, 2021          WALKUP, MELODIA, KELLY &
2                                     SCHOENBERGER

3

4                                     By:  _____
5                                          RICHARD H. SCHOENBERGER
                                           SPENCER J. PAHLKE
6                                          SARA M. PETERS
                                           Attorneys for Plaintiffs CLAUDIA
7                                          APOLINAR and EMMANUEL PEREZ-
                                           PEREZ
8

9                                          ERIC TIRSCHWELL*
                                           LEN KAMDANG*
10                                         EVERYTOWN LAW

11                                         Attorneys for Plaintiffs CLAUDIA
12                                         APOLINAR and EMMANUEL PEREZ-
                                           PEREZ
13                                         *Motions for admission *pro hac vice*
                                           pending
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA  STREET
26TH  FLOOR
SAN  FRANCISCO,  CA   94108
(415)  981–7210

36
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196

1

## DEMAND FOR JURY TRIAL

2       Plaintiffs hereby request a trial by jury.

3

4   Dated:  August 20, 2021                WALKUP, MELODIA, KELLY &
                                           SCHOENBERGER
5

6

7                                          By:
                                              _____
8                                             RICHARD H. SCHOENBERGER
                                              SPENCER J. PAHLKE
9                                             SARA M. PETERS
                                              Attorneys for Plaintiffs CLAUDIA
10                                            APOLINAR and EMMANUEL PEREZ-
                                              PEREZ
11
                                              ERIC TIRSCHWELL*
12                                            LEN KAMDANG*
                                              EVERYTOWN LAW
13

14                                            Attorneys for Plaintiffs CLAUDIA
                                              APOLINAR and EMMANUEL PEREZ-
15                                            PEREZ
                                              *Motions for admission *pro hac vice*
16                                            pending

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES OF
WALKUP, MELODIA, KELLY
& SCHOENBERGER
A PROFESSIONAL CORPORATION
650  CALIFORNIA  STREET
26TH  FLOOR
SAN  FRANCISCO,  CA   94108
(415)  981-7210

37
FIRST AMENDED COMPLAINT FOR DAMAGES – CASE NO. 21STCV29196